Shawna Lyn CULTER, Petitioner,

v.

UNITED STATES of America,
Respondent,

No. CR. 01–439(ESH).
No. CIV.A. 03–0106(ESH).

United States District Court,
District of Columbia.

Jan. 27, 2003.

Tony Lennell Axam, Fed. Public Defender for D.C., Washington, DC, for Shawna Lyn Culter.

Elizabeth Cheryl Coombe, U.S. Attorney's Office, Washington, DC, for U.S.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Relying on a long-standing policy of the Bureau of Prisons ("BOP") whereby the agency honored judicial recommendations regarding the placement of Zone C offenders, this Court sentenced Shawna Culter to 12 months imprisonment on March 28, 2002, and strongly recommended that she be placed in a Community Corrections Center ("CCC" or "halfway house"). As it had assured the Court that it would, BOP followed this recommendation, and on June 10, 2002, petitioner began serving her sentence at the Fairview CCC in Washington,

D.C. As of December 16, 2002, however, BOP's policy abruptly changed. Based on a memorandum prepared by the Department of Justice's Office of Legal Counsel on behalf of Deputy Attorney General Larry Thompson, BOP announced that it could no longer use CCCs as a substitute for imprisonment. This policy was to be applied prospectively, with one significant exception: inmates housed in CCCs who, as of December 16, 2002, had more than 150 days remaining on their sentences would be transferred to prisons. On that date, petitioner had 174 days left to serve. Accordingly, on December 23, BOP notified her that she would be moved out of the halfway house and into a federal prison within 30 days—that is, on or before January 23, 2002.

Petitioner has now brought a motion under 28 U.S.C. §§ 2241 and 2255 asking that the Court vacate, set aside, or correct the sentence that it imposed on March 28. While the government persuasively argues that the Court cannot grant the specific relief requested, the Court is persuaded that on the unique and compelling facts of this case, principles of equitable estoppel and due process preclude BOP from relying on its new policy to remove petitioner from her current placement. The Court will therefore grant petitioner's motion, and enter an order enjoining BOP from transferring her from Fairview on the basis of the newly-announced DOJ policy regarding BOP's lack of authority to substitute halfway house placement for imprisonment.

## BACKGROUND

On January 8, 2002, petitioner pleaded guilty to one count of uttering a forged security in violation of 18 U.S.C. § 513(a). All parties agreed with the presentence report's determination that her adjusted offense level was 10 and her criminal history category was III. As a result, petitioner fell within "Zone C" of the Sentencing Guidelines and faced a sentencing range of 10–16 months. Zone C guideline ranges must be satisfied either by a "sentence of imprisonment" or by a "sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention ... provided that at least one-half of the minimum term is satisfied by imprisonment." 2002 U.S. Sentencing Guidelines Manual ("USSG") § 5C.1.1(d). At sentencing, petitioner sought a downward departure to Zone B, which would have allowed for a sentence of home detention. USSG § 5C1.1(c)(3). (Def.'s Mot. for Downward Departure, 3/20/02, at 16.)

Although the Court denied her departure request, the Court took pains to craft a sentence that would allow petitioner to continue working, and thus meet her restitution obligations, and to maintain her community contacts, which had become a source of increased stability in her life and had contributed much to her ongoing rehabilitation. Petitioner, who at a young age was sexually abused by her father, has been diagnosed with Bipolar Disorder, which may have played a role in her crimes. Untreated in the past, the illness caused her to experience debilitating, even suicidal, depression, often followed by periods of manic behavior. However, since November 2000, she had been taking medication to treat this condition and was participating in weekly counseling sessions with Janice Rogers of Our Place, D.C., a local resource and support center for women returning to the community after periods of incarceration. Moreover, by the time of her sentencing, petitioner had begun working as a member relations specialist at CAPCON Library Network. She had been saving some of her salary from this position in order to pay restitution to the former employer whom she had de-

frauded. Moreover, she had become an active member of the Foundry United Methodist Church, and in that capacity, she was serving as a mentor to younger members and participating in various charitable projects.

Indeed, all indications were that petitioner had begun the process of turning her life around. Recognizing and seeking to encourage these positive trends, the Court sought to fashion a sentence that would punish petitioner for her offense without interrupting the admirable strides she had made to rehabilitate herself. The Court believed that it was vital for petitioner to continue her participation in church activities, her therapy, and her paid employment. It was hoped that doing so would assist her reintegration into law-abiding society, her mental health recovery, and her ability to meet her restitution obligations. The Court decided that the best way to achieve these ends was for her to be committed to BOP for 12 months with the understanding that she would serve this sentence in a local halfway house. (Tr. of Sent., 3/28/02, at 28 ("It is expected that she will be able to from a halfway house continue with her therapy, to be released to work and to participate in church activities."), 30 ("I expect that this period of a year in the halfway house . . . will give you ample opportunity both to pay back the money you owe and to repair your family relationships.").) Moreover, the Court's decision to order $100 a month in restitution was explicitly "premised on the Court's recommendation to the Bureau of Prisons that [petitioner] not be required to pay 25 percent of her income to the halfway house." If this was not to be followed, the Court observed, "I would perhaps have to reconsider the $100 a month restitution." (*Id.* at 28–29.) With

this understanding that petitioner would be placed in a halfway house, the Court had no need to downwardly depart so as to remove petitioner from Zone C.

As is clear from the sentencing proceedings, halfway house placement was central to the Court's overall sentencing objectives. In this respect, the Court relied on BOP's long-standing practice of following a judicial recommendation that a Zone C offender serve her full sentence in a CCC. This reliance was far from fanciful, but was in fact induced by the government's own policies and statements, which gave the Court every reason to expect that its placement recommendation would be carried out. There is no dispute that at the time petitioner was sentenced, BOP had consistently construed the phrase "sentence of imprisonment" in USSG § 5C1.1(d) to include confinement in a halfway house. This interpretation, and the inmate designation policies that went along with it, date back to the very beginning of the Sentencing Guidelines. Indeed, since the Guidelines took effect in 1987, BOP has *never* interpreted them to preclude halfway house designation as a means to satisfy a "sentence of imprisonment." [1] Across the country, the agency's statements and its actions told judges that if they recommended CCC placement for a Zone C offender such as Shawna Culter, those recommendations would generally be followed.

Consistent with this understanding of BOP's authority, U.S. Attorney's offices nationwide have routinely consented to, or at least and acquiesced in, such placements. Indeed, the Probation Office in this jurisdiction has informed the Court that since January 1, 1999, BOP has designated 93 Zone B and C offenders to serve "a sentence of imprisonment" under USSG

---

1. At oral argument, BOP acknowledged that it reaffirmed this interpretation in a 1998 Policy Statement. (Oral Argument Tr., 1/21/03, at 17–18.)

§ 5C1.1(c)-(d) in CCCs, based on judicial recommendations for such placement. The government's acquiescence has not merely been passive. Federal prosecutors have even entered into plea agreements not to oppose halfway house placement for Zone C, and even Zone D, offenders. *See* Attach. A, ¶ 8(g).

These practices were entirely routine, and were all but taken for granted by all participants: the BOP, the Probation Office, the U.S. Attorney's Office, the defense bar, and the judiciary. There is no indication that the government in this jurisdiction has ever previously objected to, or disputed the legality of, a court's recommendation of halfway house placement for a Zone C offender, and there is no indication that the DOJ had ever suggested, prior to December 2002, that BOP lacked the legal authority to follow through with such a designation. The Court was not then and, is not now, aware of any previous case—in this district or elsewhere—where BOP's designation authority had been challenged by the government. Certainly, no objection was offered at the time of sentencing in this case. As such, the idea that petitioner could not have served her full sentence in a halfway house was simply not a possibility at the time that she was sentenced. Indeed, at oral argument, the government agreed that both petitioner and the Court had every right to expect that the Court's request for CCC placement would be followed and that petitioner would be permitted to serve out her sentence in a halfway house. (Oral Argument Tr., 1/21/03, at 34 ("I don't think this Court could have known that at the time it sentenced the defendant the Bureau of Prisons would not honor its recommendation."), 36 ("It was a reasonable expectation at that time.").)

But there is more. In crafting a sentence that (as noted above) was anchored to the expectation that petitioner would be designated to a CCC, the Court relied not merely on BOP's past practices but on specific representations from that agency. Prior to sentencing, the Court spoke to representatives from the Probation Office in an effort to determine whether BOP would honor the Court's recommendation. Based on the Probation Office's conversations with various BOP personnel, including a Community Corrections Manager ("CCM"), the Court was assured both that space was available in a local halfway house and that petitioner could and would be designated to serve her sentence at that location if the Court elected to so recommend. This is why, at the end of the sentencing hearing, the Court engaged in a colloquy with the probation officer, in which the officer again informed the Court that petitioner would be able to self-surrender to the halfway house in four to six weeks "since we do have bed space." (Tr. of Sent., 3/28/02, at 31.) Had the Court not received such assurances, it would have viewed its overall sentencing options in a far different light.

In short, the Court's sentence was premised on an *explicit* understanding of where petitioner would serve her time that was the product not merely of unchallenged and longstanding government practices, but that was also firmly rooted in the BOP's representations that it both had the authority and the willingness to abide by the Court's recommendation *in this case*.

And BOP did abide. On June 10, 2002, petitioner began serving her 12–month sentence at the Fairview CCC in Washington, D.C. Everything that she has done since reporting there has only confirmed the Court's belief that halfway house placement was the best available sentencing option for her. Indeed, it is clear from the numerous letters that the Court has received, including those from her em-

ployers and pastor, that Shawna Culter's rehabilitation has continued, and even accelerated, exactly as the Court had hoped. Indeed, her employer CAPCON was so impressed with her talents and abilities that soon after sentencing she was elevated to full-time status, and as her supervisor has indicated, petitioner has been assuming more responsibilities with great success and has become a valued member of the organization's staff. (Letter from Susan Eason, 12/30/02.)

In addition to offering her skills and stability, this job has provided petitioner with a steady income, which she has used to make restitution in excess of her court-imposed monthly obligations. Moreover, according to her pastor, petitioner has continued her active membership in the Foundry United Methodist Church, where she has developed a caring and supportive community that has nurtured her emotional and spiritual growth. (Letter from Dean Snyder, 12/30/02.) She has also continued with her medication and therapy, and shows continued improvement in her psychological condition. Finally, it has been reported by the probation department that petitioner's conduct at the halfway house has been exemplary.

Now, however, this success is threatened, not by anything that petitioner has done, but rather by a newly-announced change in BOP policy. On December 16, 2002, Deputy Attorney General Larry Thompson informed Kathleen Hawk Sawyer, Director of BOP, of a memorandum prepared by the Office of Legal Counsel ("OLC"), which concluded that the Bureau's policy of interpreting "imprisonment" to encompass CCCs was unlawful and should be discontinued. Specifically, the memo determined that Sentencing Guidelines precluded BOP from implementing Zone C sentences of imprisonment by placing offenders in CCCs.[2] While for the most part this change was to apply prospectively (*i.e.*, to offenders who had not yet been sentenced), the Deputy Attorney General carved out an important exception. He directed BOP to "transfer to an actual prison facility all federal offenders currently residing in a CCC who, as of today, have more than 150 days remaining on the imprisonment component of their sentence." (Memorandum from Larry D. Thompson to Kathleen Hawk Sawyer, 12/16/02.) Absolutely no explanation was offered for this particular exception from the decision not to apply the policy retroactively.

BOP informed federal judges of this "important procedure change" on December 20, 2002 (Memorandum from Kathleen Hawk Sawyer for Federal Judges, 12/20/02), and on December 23, petitioner received notice that pursuant to DOJ's directive, she would be moved from Fairview to the federal prison in Alderson, West Virginia within 30 days. (Memorandum from Linda Moore, CCM, for Shawna Culter, 12/23/03.) Petitioner fell into the group of those to whom the changed policy was to apply retroactively because, as of December 16, she exceeded the 150–day cutoff by a mere 24 days.[3] Faced with the

---

**2.** While OLC's determination that the old policy was irreconcilable with the text of the Guidelines, specifically § 5C1.1(d), was based on several judicial decisions construing that latter provision, *see United States v. Serafini*, 233 F.3d 758 (3d Cir.2000); *United States v. Jalili*, 925 F.2d 889 (6th Cir.1991), there has been no suggestion that the BOP policy had actually been invalidated by a court or that

the change in policy was prompted by a specific judicial directive. Nevertheless, petitioner has not challenged the *prospective* application of the interpretation recommended by OLC, and thus the Court need not address the OLC's legal analysis or the correctness of BOP's revised policy.

**3.** She was not alone. At oral argument BOP reported that 132 CCC inmates nationwide

imminent prospect of transfer, which would have taken her out of the halfway house until at least May,[4] on December 31, petitioner filed a Motion for Reconsideration of Conditions of Confinement Imposed Pursuant to Sentence, in which she asked the Court to reconsider its sentence in light of BOP's revised understanding of its authority under the Guidelines. The government objected on the grounds that the Court lacked the authority under Rule 35 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3582 to modify its sentence at this late date.[5] Subsequently, petitioner filed the instant motion under 28 U.S.C. §§ 2241 and 2255 in order to block BOP from applying its new policy to her. The government objected to this motion as well, and the Court heard oral argument on January 21, 2003. Subsequently, on January 23, the government filed a supplemental memorandum addressing the argument that the application of BOP's new policy would be unconstitutional.

## ANALYSIS

As the government frames this case, it is one where BOP is simply trying to correct a mistake that it had made over the last 15 years regarding the proper interpretation of its authority under the Sentencing Guidelines. According to the government, BOP had long misunderstood its discretion to substitute CCCs for "imprisonment" under § 5C1.1, and is now seeking to conform its action to the requirements of that provision. Even if one accepts the argument that the policy was incorrect,[6] that

have been affected by the Bureau's 150–day rule. Interestingly, the burden of the changed policy and this arbitrary cutoff has fallen more heavily on female inmates. Over a third of those now faced with transfer (45 of 132) are women, compared with an overall federal inmate population of only 6.9% female. (Oral Argument Tr., 1/21/03, at 27–28.)

4. Congress has encouraged BOP to ensure that prisoners serve a "reasonable part"—but not more than six months or 10 percent of their overall term—"under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community." 18 U.S.C. § 3624(c). This so-called "pre-release custody" typically includes transferring the inmate from a prison into a CCC. According to BOP, petitioner's eligibility for pre-release custody would begin on May 4, 2003.

5. The Court agrees that neither the Rule nor the statute confer jurisdiction on the Court to resentence petitioner at this time. 18 U.S.C. § 3582(c) permits the modification of a term of imprisonment only: (1) upon motion of the Bureau of Prisons (no such motion has been made here); (2) if the Guideline range is reduced by the Sentencing Commission subsequent to sentencing (which has not happened in this case); or (3) consistent with Rule 35. In turn, Rule 35 allows for the correction of a sentence in only two situa-

tions: (1) within 7 days of sentencing, the Court may correct a clear error in the sentence; (2) the Court may reduce a sentence upon motion of the government if the defendant provides substantial assistance to the government. Obviously, neither circumstance is presented here.

6. If, on the other hand, the old policy *was* a permissible interpretation of the Guideline provision, a different constitutional issue would then arise. For if BOP were to impose a new policy retroactively that has the effect of depriving an inmate of the possibility of halfway house placement, and instead mandated her immediate transfer to prison, there would be obvious *ex post facto* concerns, for it is generally accepted that changes in administrative policy that result in increased punishments are cognizable under the clause. *See Davis v. Moore*, 772 A.2d 204, 216 (D.C.2001) ("[A] new regulation which that enhances punishment beyond what was formally authorized by a valid penal regulation is within the *Ex Post Facto* prohibition."); *Garner v. Jones*, 529 U.S. 244, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000) (applying *ex post facto* analysis to changes in executive branch policy); *see also California Dep't of Corrections v. Morales*, 514 U.S. 499, 509, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (ex post facto Clause offended when retroactive change in the law increases the "measure of punishment" imposed on in-

neither terminates the constitutional inquiry nor conclusively establishes that BOP is free to apply its new interpretation retroactively to petitioner.

To be sure, the general rule in such circumstances is that mistakes on the part of the government, such as its misinterpretation of applicable law, do not prevent the government from correcting those mistakes when they are discovered. *See Lerner v. Gill,* 751 F.2d 450, 459 (1st Cir.1985) ("Only in rare circumstances have courts allowed the misconstructions of officials to estop the proper execution of state or federal law, and such cases have involved prejudice and harm beyond frustrated expectations."). However, in certain unique cases, courts have found that the belated correction of a sentencing mistake can be "so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause." *DeWitt v. Ventetoulo,* 6 F.3d 32, 35 (1st Cir.1993); *see also Davis v. Moore,* 772 A.2d 204, 220 (D.C.2001) (suggesting that a due process claim could be made out on behalf of prisoners whose incorrect expectations about the length of their sentences were created by government error in cases of "governmental culpability and unusual prejudice to the affected prisoner"); *United States v. Mercedes,* 1997 WL 458740, at *2 (S.D.N.Y.1997) (holding that, where sufficiently egregious, the "government's delay in executing a sentence may constitute a 'waiver' of jurisdiction over an individual under an otherwise valid criminal sentence, such that the fundamental principles of liberty and justice secured by the Due Process Clause of the Fifth Amendment would be violated by requiring that individual to serve the sentence") (internal quotation marks omitted); *cf. Blair–Bey v. Quick,* 151 F.3d 1036, 1048 n. 11 (D.C.Cir.1998) ("There is some authority for the proposition that exceptionally arbitrary governmental conduct may in itself violate the due process clause, whether or not a liberty or property interest is at stake.").

This same result is reached via the doctrine of equitable estoppel, which has also been used to enjoin the government from correcting its legal errors where to do so would work a serious individual injustice not counterbalanced by considerations of the public interest. Thus, in *Johnson v. Williford,* 682 F.2d 868 (9th Cir.1982), the Ninth Circuit applied equitable estoppel to bar the government from revoking the parole of a felon who had been wrongfully paroled. Central to the court's decision was the fact that prison officials had repeatedly missed the error and actively advised the parolee on several occasions that he could and would be released if he continued his good behavior. *See id.* at 871–73.

 Whichever rubric is applied, the Court is of the opinion that this is the unusual case where the government's longstanding alleged misinterpretation of the law, and the reliance induced by that misinterpretation, now precludes the government from retrospectively correcting its mistake by sending petitioner to prison. In *DeWitt,* the First Circuit suggested that in evaluating a due process attack on the government's delayed attempt to correct a sentencing error several factors should be considered: the length of time

---

mate); *Lindsey v. Washington,* 301 U.S. 397, 401–02, 57 S.Ct. 797, 81 L.Ed. 1182 (1937) (holding that the "[r]emoval of the *possibility*" of a lesser sentence violated the Clause "in the sense that the standard of punishment adopted by the new statute is more onerous than that of the old"); *In re Medley,* 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890) (holding that a new law requiring solitary confinement for prisoners sentenced to death could not be imposed on an inmate sentenced before the law was enacted).

between the mistake and the attempted correction; whether the defendant contributed to the mistake; the reasonableness of defendant's intervening expectations; the prejudice resulting from the change; and the government's diligence in seeking the change. *See* 6 F.3d at 35. Here, while BOP was undoubtedly diligent in correcting the mistake once DOJ ordered it to do so, the Bureau's misguided policy was in effect without interruption for over fifteen years. Moreover, the government did not uncover its error until petitioner had served nearly half her sentence. Petitioner did not contribute in any way toward the mistake, which was entirely the government's own doing. Given the consistency of BOP's previous understanding, petitioner's expectations that she would remain the halfway house were certainly reasonable, and as is explained in greater detail below, the prejudice that would be wrought by a change in her confinement at this time is severe. Thus, under the factors identified in *DeWitt*, petitioner presents a significant due process challenge to her impending transfer.

The constitutional analysis set out in *Davis v. Moore* is instructive as well. There, the D.C. Court of Appeals rejected a constitutional challenge brought by a group of D.C. inmates who had been reimprisoned following revocation of their parole. These inmates had seen their sentences recomputed to eliminate credit for "street time" (the time served on a sentence by an individual released from prison on parole), even though at the time of sentencing a D.C. Department of Correc-

tions' regulation gave inmates such credit. This regulation, however, was subsequently invalidated by the D.C. Court of Appeals. *See U.S. Parole Comm'n v. Noble*, 693 A.2d 1084 (D.C.1997). In *Davis*, the Court held that the retroactive recomputation based on *Noble* did not violate the Due Process Clause because the old regulation on which the inmates had relied was simply wrong, as was the advice they had received from D.C. officials pursuant to that regulation. *See* 772 A.2d at 219–20.

That case, however, differed from the present one in several important ways that actually reinforce petitioner's due process argument. In reaching its conclusion, the *Davis* court suggested that a prisoner's expectation about his sentence that is induced by "the mistaken representations of officials does not *without more*" give rise to a due process claim. *Id.* at 219 (emphasis added). Here, however, there is "more." What was missing in *Davis* that is present in this case is that the mistake did not only engender petitioner's false expectations, but actually affected the Court's sentencing decision in a material way. The Court did not have merely a hope or expectation that petitioner would serve her sentence in a halfway house, an expectation that has been undercut by the new policy. *Cf. United States v. Addonizio*, 442 U.S. 178, 190, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979) (holding that in the absence of a constitutional violation, a § 2255 motion cannot be based on a Parole Board decision that frustrates the expectations of the sentencing judge).[7] Instead,

---

7. The government's suggestion that *Addonizio* precludes the Court from entertaining petitioner's § 2255 motion is misplaced for two reasons. First, that case involved only a claim that the new policies of the Parole Board had prolonged the prisoner's sentence beyond the period expected by the sentencing judge. These expectations were based on the judge's understanding of how the parole system generally worked at the time of sentencing. There was no suggestion there that the government had in any way misrepresented the nature of its own authority to. the court, or that the court would have sentenced differently had it known of the changes that were coming.

*in deciding what sentence to impose,* the Court relied on years of consistent practice, as well as representations that BOP would honor the Court's placement recommendation. As such, the harm that petitioner faces if BOP's policy is retroactively applied to her is not merely (as it was in *Davis*) that of having her artificially "elevated hopes" of doing her time in a CCC dashed.[8] *Lerner,* 751 F.2d at 459. Instead, she is now facing a very real and very tangible prejudice: the subversion of her ability to have the Court impose sentence at a time when the government is accurately representing the authority of the BOP to effectuate the Court's sentence.

Indeed, had the Court at the time of sentencing been advised of BOP's newfound position that a Zone C offender cannot serve her full sentence in a halfway house, petitioner's resulting sentence would undoubtedly have been different. *See Davis,* 772 A.2d at 221 n. 13 (noting

that a defendant might be able to show actual prejudice for purpose of a due process claim if there were evidence that the trial judge could have sentenced differently had the judge been aware of the interpretive change that the government subsequently announced). As described above, the Court's paramount concern in this case was to ensure that in serving her sentence, the positive trends in petitioner's life—her work, her community activities, her therapy—would be uninterrupted to the greatest extent possible. The Court believed then, and it continues to believe now, that this goal is incompatible with incarceration.

Accordingly, if the Court had been so prescient as to know that DOJ would require BOP to send Zone C offenders to prison, the Court would have looked quite differently at petitioner's two-level departure request, which would have dropped her into Zone B, thereby avoiding the mandatory imprisonment requirement of

---

Moreover, as the case was framed by the Supreme Court, there was no constitutional claim at issue. The basis for Addonizio's § 2255 motion was not that the retroactive application of the Parole Board's new policy violated the *Ex Post Facto* Clause (an issue that the Court explicitly sidestepped, *see* 442 U.S. at 184, 99 S.Ct. 2235) or the Due Process Clause. Rather, the argument was that keeping him in prison for a longer period than was subjectively expected by the sentencing court (an expectation that was not even memorialized in the actual sentence, *see id.* at 180 n. 2, 99 S.Ct. 2235) was itself grounds for a collateral attack on the original sentence. In the present case, by contrast, petitioner's claim is explicitly a constitutional one, and thus fits comfortably within the traditional rubric of §§ 2241 and 2255. *Cf. Davis,* 772 A.2d at 214 (using writ of habeas corpus to bring constitutional challenge to sentence extended beyond expectation by allegedly unforseen revocation of inmate's street time credit).

8. This is not to suggest that the direct harms that petitioner would face were she to be transferred to prison are not significant and severe. Quite the contrary. Her employer

has indicated that although she has become "indispensable" and has met every expectation that CAPCON has outlined for her, the organization would have no choice but to terminate her employment were she to be moved out of the halfway house and into a federal facility from which she would be unable to report to work. (Letter from Robert Drescher, 1/10/03.) Moreover, her family fears, quite reasonably, that sending her to prison, and thereby denying her access to the support of her church community, to the stability of her job, and to the guidance of her therapist, would have serious consequences for her rehabilitation. Thus, it is likely that even a relatively short stint in prison could lead to a significant set back. As such, if the new BOP policy is applied to petitioner retroactively, it could have substantial negative consequences far beyond the fact of imprisonment. *Cf. Mercedes,* 1997 WL 458740, at *4 ("Returning Mercedes to prison after he had reestablished his roots in the community will result in severe, and unnecessary prejudice to him and his family.").

USSG § 5C1.1(d). Certainly, there were ample grounds for such a departure, given defendant's post-offense rehabilitation efforts, the effect of her debilitating psychological condition on her commission of the underlying offense, and the demonstrated need for community confinement for purposes of treatment. *See* Def.'s Mot. for Downward Departure at 5–11; Application Note 6 to § 5C1.1;[9] *In re Sealed Case,* 292 F.3d 913, 917 (D.C.Cir.2002). Had the government come forward *then* with the interpretation of the law that it *now* believes proper, the Court would have sentenced differently. Thus, if petitioner is to be sent to prison now, that misfortune would fall upon her only because the government discovered its error neither in time to help nor too late to hurt. In effect, then, the government seeks to reap the benefit of both the interpretive error (which induced the Court into entering the sentence that it did) and the correction of that error (on which BOP relies to transfer petitioner to prison). Such a result is, in this Court's view, fundamentally unfair and incompatible with due process.

Contrary to the government's argument, this is not merely a case of "frustrated expectations." (Oral Argument Tr., 1/21/03, at 49.) Rather, this is a case in which the government's long-standing interpretation and application of the law—as well as its specific representations regarding this petitioner's eligibility for halfway house placement—affirmatively misled the Court into imposing a particular sentence. As such, it is a case in which the *ex post* error correction that the government seeks to apply to petitioner threatens to upset not merely her subjective expectations, but to leave her in a substantially worse position than she would have been in had the government not erred in the first place. Thus, the suggestion of actual prejudice resulting from the mistake, which was merely an unsupported assertion in *Davis,* 772 A.2d at 221, is a reality in this case. *See Lerner,* 751 F.2d at 459 (due process violation based on belated correction of official mistake requires "tangible prejudice," not merely psychological harm).[10] Given these unique circumstances, the Court concludes that BOP is estopped from relying on its new policy directive to remove petitioner from the halfway house. For the government to imprison petitioner merely because BOP was misguided about the scope of its authority and this misinterpretation was fostered and shared by both the Executive

---

**9.** In order to apply Application Note 6, the Court would have had to find that community confinement was warranted "to accomplish a specific treatment purpose," and that the treatment problem to be addressed was both related to defendant's criminality and was likely to be eliminated by successful completion of the treatment program. In light of petitioner's bipolar disorder, for which she was already undergoing successful treatment at the time of sentencing, such findings could readily have been supported in this case.

**10.** Moreover, the *Davis* court determined that the change in policy regarding street time credit was foreseeable in light of the fact that the U.S. Parole Commission had long taken the view that D.C.Code offenders within its control were not entitled to street time credit.

As such, "the law in this area was unsettled" and the inmates had "actual warning" of the eventual change. 772 A.2d at 218–19. Here, in contrast, DOJ's determination that BOP lacked the authority to substitute halfway house placement for imprisonment was entirely unforeseeable by petitioner, the Court, and the government. Thus, while in *Davis* reliance should arguably have been tempered by the conflicting interpretations of the same law being offered by different agencies, in the present case the government was united in its position and only last month did it suddenly and without warning reverse course. This lack of foreseeability renders all the more unfair BOP's belated exercise in error correction.

and Judicial branches for more than fifteen years is simply arbitrary and unfair.[11]

### CONCLUSION

For the reasons set forth above, the Court holds that the Bureau of Prisons is estopped from applying its newly-announced policy regarding the placement of Zone C offenders to transfer Shawna Culter from the CCC in which she currently resides to a federal prison. To do so under the unique circumstances presented here cannot be squared with fundamental notions of due process. Insofar as the old policy was truly illegal and the new policy was necessary to bring BOP into compliance with the Sentencing Guidelines, applying this unexpected and unforeseeable change would, in light of the Court's reasonable and government-induced reliance on the old policy, violate the Due Process Clause.

### *ORDER*

For the reasons set forth in the attached Memorandum Opinion, it is hereby

**ORDERED** that petitioner's motion to Vacate, Set Aside, or Correct Sentence is **GRANTED IN PART**; and it is

**FURTHER ORDERED** that the Bureau of Prisons is enjoined from transferring Shawna Culter from the Fairview Community Confinement Center pursuant to the new inmate designation policy described in the December 16, 2002 Memorandum from Deputy Attorney General Larry Thompson to BOP Director Kathleen Hawk Sawyer.

**It is so ordered.**

---

11. Applying BOP's new policy to petitioner retroactively is especially arbitrary since petitioner is subject to transfer *only* because she had more than 150 days remaining on her sentence as of December 16, 2003. In other words, the difference between her staying in the halfway house and her being put into prison is a matter of 24 days. In the first place, BOP has offered no explanation as to why it carved out this 150–day exception to its decision to otherwise apply the new placement policy prospectively. As a general matter, this cutoff seems entirely irrational. In petitioner's case, however, the situation is particularly arbitrary. Although petitioner was sentenced on March 28, 2002, the Court's Judgment and Commitment Order ("J & C") did not issue until May 8, thereby pushing back the start of petitioner's sentence. In addition, by that time, space was not available for petitioner to begin her sentence until June 10. If these delays had not occurred, petitioner would not have come within BOP's 150–day rule, and thus would not now be subject to transfer. As such, the circumstances that caused petitioner to miss the already-arbitrary cutoff are themselves nothing but a fortuity that further reinforces her due process claim.