**Patricia PEARSON, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

No. 03–C–253.
No. 02–CR–40.

United States District Court, E.D. Wisconsin.

May 19, 2003.

Brian P. Mullins, for Petitioner.

Gail Hoffman, for Respondent.

### DECISION AND ORDER

ADELMAN, District Judge.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Patricia Pearson ("petitioner") brings this action under 28 U.S.C. § 2255 claiming that she was denied due process because she was sentenced based on false information. I previously stayed execution of the sentence pending resolution of her claim.

The relevant facts are as follows. Petitioner pled guilty to one count of bank larceny, and a pre-sentence report ("PSR") was prepared in anticipation of sentencing. The PSR stated that under the sentencing guidelines petitioner's offense level was 12 and her criminal history category was I, producing an imprisonment range of 10 to 16 months and placing petitioner in "Zone C" of the sentencing grid. For offenders in Zone C, the minimum term of imprisonment may be satisfied by (1) a sentence of imprisonment or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes

community confinement or home detention for no more than one half of the minimum term. U.S.S.G. § 5C1.1(d).

Claiming that her ill and infirm parents relied on her for care, petitioner moved for a two-level downward departure pursuant to U.S.S.G. § 5H1.6. A two level departure would have put petitioner in Zone B, making her eligible for a sentence of probation with a condition of home confinement. *See* U.S.S.G. § 5C1.1c.

Prior to sentencing, I sought to determine whether I could fashion a sentence that would permit petitioner to continue caring for her parents without departing from the guidelines. I knew that based on a judge's recommendation the Bureau of Prisons ("BOP") would permit a Zone C offender to serve the imprisonment portion of a sentence in a community correctional center ("CCC"), where the offender could be released for specified purposes, such as work and family care. However, to make certain that the BOP would designate petitioner to a CCC, I asked the probation officer to contact the BOP and determine whether it would honor a recommendation for CCC placement in this case. The probation officer called the BOP and was assured that if I recommended it petitioner would be placed in a CCC.

Based in part on this assurance, I denied petitioner's motion for a downward departure. I stated that the motion was a "close call" but that I was "not totally convinced that it's quite strong enough [of a] case to depart, and I think the same purpose can be accomplished in another way without requiring the departure ...." (10/4/02 Tr. at 4). I then imposed a split sentence: five months imprisonment, which I recommended be served at a local CCC known as Parson's House with work release and parent care privileges, followed by five months of home confinement as a condition of supervised release.

However, before petitioner commenced serving her sentence, the Office of Legal Counsel of the Department of Justice issued a memorandum (hereafter the "OLC memorandum") stating that the BOP lacked authority to designate Zone C and D offenders to a CCC. The BOP subsequently advised federal judges that such offenders would be sent to prisons regardless of whether the sentencing judge recommended CCC placement. The BOP then informed me that based on the OLC memorandum petitioner would not be placed at Parson's House but rather sent to a prison in Greenville, Illinois.

## II. DISCUSSION

■ "Convicted defendants, including those who plead guilty, have a due process right to a fair sentencing procedure which includes the right to be sentenced on the basis of accurate information." *United States v. Rone,* 743 F.2d 1169, 1171 (7th Cir.1984) (citing *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972)). In order to establish a violation of this right, a defendant must show (1) that the information before the sentencing court was false and (2) that the court relied on the false information in passing sentence. *Id.* (citing *United States v. Harris,* 558 F.2d 366, 375 (7th Cir.1977)). I conclude that petitioner has established both factors.

■ First, the BOP provided false information to the court by representing that it would honor my recommendation that petitioner be placed in a CCC. I note that this representation was consistent with the BOP's longstanding practice of following judges recommendations for such placements. *E.g., Iacaboni v. United States,* 251 F.Supp.2d 1015, 1017–18 (D.Mass. 2003); *Culter v. United States,* 241 F.Supp.2d 19, 19–20 (D.D.C.2003). Indeed, the BOP's authority to place offend-

ers in petitioner's situation in CCCs was memorialized in its written policies *Howard v. Ashcroft*, 248 F.Supp.2d 518, 530–31 (M.D.La.2003) (citing PS 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure* ¶ 5 (12/16/1998) ("[T]he Bureau is not restricted by § 3624(c) in designating a CCC or an inmate and may place an inmate in a CCC for more than the 'last ten percentum of the term,' or more than six months, if appropriate."); U.S. Department of Justice, Federal Bureau of Prisons, *Judicial Resource Guide to the Federal Bureau of Prisons* 15–16 (2000) ("The Bureau may designate an offender directly to a community based facility to serve his or her sentence, but ordinarily this is done only with the concurrence of the sentencing court.")); *see also Iacaboni*, 251 F.Supp.2d 1015, 1026 (citing BOP Prog. Smt. 5100.07 ("Security Designation and Custody Classification Manual") ch. 4, at 2 (9/3/1999 with 1/31/02 changes) (stating "direct commitment to CCC's may be made on the court's recommendation")).[1] However, despite this longstanding practice, as a result of the OLC memorandum, the BOP's representation that petitioner would be placed at a CCC turned out to be false.

Second, I relied on the BOP's representation at sentencing. I denied petitioner's downward departure motion in part because, if she were placed in Parson's House, she could continue to care for her parents, making a departure unnecessary. Had I known that she would be sent to

prison, I would have viewed the departure motion differently.

In *Culter v. United States*, Judge Huvelle granted § 2255 relief on nearly identical facts. The defendant there was also in Zone C and also moved for a downward departure so that she would be eligible for home or community confinement under the guidelines. 241 F.Supp.2d at 20. Judge Huvelle denied the motion but crafted a sentence that would allow the defendant to remain in the community: she sentenced the defendant to twelve months confinement with the understanding that the defendant would serve the sentence at a local halfway house.[2] *Id.* at 21. The defendant began serving her sentence at the halfway house but was re-designated to a federal prison after the issuance of the OLC memorandum. *Id.* at 19–20.

Judge Huvelle found that the defendant's right to due process had been violated, pointing out that she had based the sentence not only on the longstanding BOP policy of following judicial recommendations for CCC placements but also on the BOP's specific representations with respect to Culter.

> Prior to sentencing, the Court spoke to representatives from the Probation Office in an effort to determine whether BOP would honor the Court's recommendation. Based on the Probation Office's conversations with various BOP personnel, including a Community Corrections Manager ("CCM"), the Court

---

1. It is also worth noting that in 1992, the OLC concluded:

    There is, moreover, no statutory basis in section 3621(b) for distinguishing between residential community facilities and secure facilities. Because the plain language of section 3621(b) allows BOP to designate "any available penal or correctional facility," we are unwilling to find a limitation on that designation authority based on legislative history.

*Id.* at 1027 (quoting Memorandum from Attorney General's Office of Legal Counsel, to Director, Federal Bureau of Prisons *4 (Mar. 25, 1992)).

2. The term "halfway house" is often used interchangeably with community correctional center. *See Howard*, 248 F.Supp.2d 518, 522–23.

was assured both that space was available in a local halfway house and that petitioner could and would be designated to serve her sentence at that location if the Court elected to so recommend. This is why, at the end of the sentencing hearing, the Court engaged in a colloquy with the probation officer, in which the officer again informed the Court that petitioner would be able to self-surrender to the halfway house in four to six weeks "since we do have bed space." (Tr. of Sent., 3/28/02, at 31.) Had the Court not received such assurances, it would have viewed its overall sentencing options in a far different light.

In short, the Court's sentence was premised on an *explicit* understanding of where petitioner would serve her time that was the product not merely of unchallenged and longstanding government practices, but that was also firmly rooted in the BOP's representations that it both had the authority and the willingness to abide by the Court's recommendation *in this case.*

*Id.* at 22.

The government argued that in banning CCC placement the BOP was merely correcting a mistake in statutory interpretation; "the general rule in such circumstances is that mistakes on the part of the government, such as its misinterpretation of applicable law, do not prevent the government from correcting those mistakes when they are discovered." *Id.* at 25. However, Judge Huvelle noted that "in certain unique cases, courts have found that the belated correction of a sentencing mistake can be 'so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause.'" *Id.* at 25 (quoting *DeWitt v. Ventetoulo,* 6 F.3d 32, 35 (1st Cir.1993)). This was such a case.

[I]n deciding what sentence to impose, the Court relied on years of consistent practice, as well as representations that BOP would honor the Court's placement recommendation. As such, the harm that petitioner faces if BOP's policy is retroactively applied to her is not merely ... that of having her artificially elevated hopes of doing her time in a CCC dashed. Instead, she is now facing a very real and very tangible prejudice: the subversion of her ability to have the Court impose sentence at a time when the government is accurately representing the authority of the BOP to effectuate the Court's sentence.

Indeed, had the Court at the time of sentencing been advised of BOP's newfound position that a Zone C offender cannot serve her full sentence in a halfway house, petitioner's resulting sentence would undoubtedly have been different. As described above, the Court's paramount concern in this case was to ensure that in serving her sentence, the positive trends in petitioner's life—her work, her community activities, her therapy—would be uninterrupted to the greatest extent possible. The Court believed then, and it continues to believe now, that this goal is incompatible with incarceration.

Accordingly, if the Court had been so prescient as to know that DOJ would require BOP to send Zone C offenders to prison, the Court would have looked quite differently at petitioner's two-level departure request, which would have dropped her into Zone B, thereby avoiding the mandatory imprisonment requirement of USSG § 5C1.1(d).

*Id.* at 27–28 (internal quote marks, footnotes and citations omitted; emphasis deleted).

Judge Huvelle rejected the government's contention that this was merely a case of "frustrated expectations." *Id.* at 28. Rather, she stated that the BOP's

longstanding policy and its representations about the defendant "affirmatively misled the Court into imposing a particular sentence." *Id.* at 28. "For the government to imprison petitioner merely because BOP was misguided about the scope of its authority and this misinterpretation was fostered and shared by both the Executive and Judicial branches for more than fifteen years is simply arbitrary and unfair." *Id.* at 28–29.

In *United States v. West,* No. 03–CV–70239, 2003 WL 1119990, 2003 U.S. Dist. LEXIS 3502 (E.D.Mich. Feb. 20, 2003), Judge Edmunds afforded relief under similar circumstances. After granting the government's request for a departure under U.S.S.G. § 5K1.1, the court sentenced West to twelve months and one day confinement and recommended that he serve the time in a CCC. *Id.* at *1, 2003 U.S. Dist. LEXIS 3502 at *2–3. Prior to imposing sentence, the court contacted the BOP and was assured that it would follow the court's recommendation. "Thus, in sentencing Petitioner to the B.O.P., th[e] Court relied on the B.O.P.'s long-standing practice of following a judicial recommendation that an offender be permitted to serve his or her sentence in a C.C.C. and on the express representation that the recommendation would be followed in this case." *Id.* at *1, 2003 U.S. Dist. LEXIS 3502 at *3. When the BOP redesignated the defendant to a federal prison after the OLC memorandum was issued, Judge Edmunds found that due process had been violated and granted the defendant's § 2255 motion.

> Placement of the Petitioner in a community corrections center was central to this Court's overall sentencing objectives. In deciding what sentence to impose, this Court relied on the B.O.P.'s long-standing practice of following a court's recommendation that an offender be permitted to serve his or her prison sentence at a C.C.C., and its express

representation that the recommendation would be honored for Petitioner West.... The B.O.P.'s policy of defining community confinement as a form of imprisonment within the Federal Sentencing Guidelines was in effect for fifteen years at the time of Petitioner's sentence and the B.O.P. did not discover their "error" in the interpretation of the sentencing guidelines until after Petitioner had served over four months of his sentence. Finally, Petitioner did not contribute to this mistake in any way. To permit the B.O.P. to apply its new policy retroactively to Petitioner and to transfer him to a federal prison would violate Petitioner's due process rights.

*Id.* at *4, 2003 U.S. Dist. LEXIS 3502 at *14–15.

Judge Edmunds rejected the government's contention that the case involved no more than frustrated sentencing expectations, stating:

> Instead, this Court believes that the government's long-standing interpretation and application of the law concerning whether an inmate could serve his or her federal sentence at a C.C.C. affirmatively misled the Court into imposing a particular sentence. In this case, the government moved at the time of sentencing for a downward departure from the sentencing guidelines based upon Petitioner's substantial assistance, pursuant to U.S.S.G. § 5K1.1. [The] government's substantial assistance motion authorizes a district court to depart from the sentencing guidelines to any reasonable sentence, so long as the sentence imposed is not specifically prohibited by statute. Had the B.O.P.'s new policy been in place at the time of sentencing, or had the Court been aware of the impending policy change, instead of sentencing Petitioner to a term of imprisonment, the Court would have sentenced Petitioner to a term of probation, with a condition of probation being Petitioner's

placement in a community corrections center. *See United States v. Canavan,* 2003 WL 245226, *1, 2003 U.S. Dist. LEXIS 1819 (D.Minn. January 22, 2003) (granting defendant's motion to correct sentence, where the B.O.P.'s subsequent policy change thwarted the court's intentions to sentence the defendant to a community corrections center). In this case, the change in B.O.P. policy, without this Court being given any notice that such a change was coming, likewise thwarted this Court's intentions of placing Petitioner in a community corrections center.

*Id.* at *5, 2003 U.S. Dist. LEXIS 3502 at *15–16 (citation omitted).

I agree with Judges Huvelle and Edmunds that where a court declines to downwardly depart based on a specific but false assurance from the BOP that the defendant will receive a CCC placement due process is violated. *See also Iacaboni,* 251 F.Supp.2d 1015, 1019 ("If I had known that, contrary to what I had been told, there was no possibility of a halfway house placement, I would certainly have considered departing downwards two levels to an Offense Level 10 (thus moving the sentence from Zone C to Zone B) and imposing precisely the same sentence, but with the assurance that it definitely would have been served in community confinement."). Therefore, § 2255 relief is appropriate.[3]

The government opposes petitioner's motion, relying primarily on *United States v. Addonizio,* 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). In that case, the Court held that § 2255 relief was not available when a post-sentencing change in Parole Commission policy frustrated the sentencing judge's subjective expectation as to how long the defendant would remain behind bars. *Id.* at 186–87, 99 S.Ct. 2235. The Court stated that § 2255 could be invoked only when the error alleged was jurisdictional, constitutional, or one of fact or law of a "fundamental" character that rendered the entire proceeding irregular and invalid. The Court held that the misinformation relied upon by the sentencing judge there was not "of constitutional magnitude." *Id.*

The government likens the "misinformation" in this case to that in *Addonizio,* but for several reasons I am unconvinced. First, unlike in *Addonizio,* petitioner's sentence was not based on a generally held notion or "expectation" about how much time she would serve; rather, it was based on the BOP's longstanding written policy regarding CCC placement and on its express assurance that petitioner would be placed in a CCC. *See Howard,* 248 F.Supp.2d 518, 530–32; *Ferguson v. Ashcroft,* 248 F.Supp.2d 547, 561 (M.D.La. 2003); *Culter,* 241 F.Supp.2d at 26 n. 7; *see also Iacaboni,* 251 F.Supp.2d 1015, 1044. "Reliance on . . . the express representation of the B.O.P. (not only as a general matter, but in Petitioner's specific case) implicates due process concerns far greater than a general awareness and reliance on the likelihood of parole, which was the issue in *Addonizio.*" *West,* 2003 WL 1119990, at *4, 2003 U.S. Dist. LEXIS 3502, at *13 n. 1. Further, there was no suggestion in *Addonizio* that "the government had in any way misrepresented the nature of its own authority to the court." *Culter,* 241 F.Supp.2d at 26 n. 7. In this case, conversely, the BOP misled the court as to its authority to place petitioner in a CCC.

---

**3.** For constitutional purposes, it is irrelevant that petitioner had not yet begun serving her sentence when the OLC memorandum was issued, unlike the defendants in *Culter* and *West* who were ordered transferred from a CCC to a prison. In all of these cases the due process violation occurred during the imposition of sentence rather than during its execution.

Second, petitioner's claim is explicitly based on the Due Process Clause, unlike that of the defendant in *Addonizio*, who asserted no constitutional basis for his motion In fact, the *Addonizio* Court made clear that its decision was limited to the issue of whether § 2255 provided the defendant with a jurisdictional vehicle to attack his denial of parole; the Court specifically declined to decide whether the changes in Parole Commission policy violated the enabling statute or the Constitution. 442 U.S. at 184, 99 S.Ct. 2235. Like *Culter*, the present case differs from *Addonizio* because "petitioner's claim is explicitly a constitutional one, and thus fits comfortably within the traditional rubric of ... § 2255." *Culter*, 241 F.Supp.2d at 27 n. 7.

Third, contrary to the government's assertion, *Addonizio* does not hold that only misinformation about a defendant's criminal activities or history could "undermine the integrity of a sentence so significantly as to render it invalid." *Iacaboni*, 251

F.Supp.2d 1015, 1042. Misinformation regarding the manner in which a sentence will be executed may provide a basis for relief as well. For example, in *King v. Hoke*, 825 F.2d 720 (2d Cir.1987), the court found that the sentencing judge's incorrect understanding of the defendant's parole eligibility date deprived the defendant of due process at his sentencing hearing. The *King* court distinguished *Addonizio* because the sentencing judge had made an "objectively ascertainable error" about the defendant's minimum statutory parole eligibility date by relying on a repealed statute.[4] *Id.* at 724–25. In *Iacaboni*, where the defendants lost the opportunity for CCC placement based on the OLC memorandum, the court granted relief on a similar theory:

> Here, I made an "objectively ascertainable error" in imposing these sentences, as a result of what the BOP now tells me was a mistaken factual assumption. This assumption was that all three of these petitioners would be eligible for

**4.** It might be argued that *King* is inapposite because the sentencing judge in that case relied on a statute that had previously been repealed, whereas in the present case the rule on CCC placement was changed *after* sentencing. The argument would be that the present case involves only a faulty prediction as to how the BOP would act rather than an "objectively ascertainable error." For several reasons this argument would fail. First, there was no mistaken prediction as to how the BOP would exercise its discretion in this case but rather an affirmative misrepresentation by the BOP that petitioner would be placed in a CCC. Moreover, the BOP's designation of petitioner to a prison was not an exercise of discretion at all but rather a disavowal of the discretion afforded to it by Congress in 18 U.S.C. § 3621(b). Second, the BOP's abrupt reversal of its settled practice was something petitioner could not possibly have predicted at the time of sentencing. *See DeWitt*, 6 F.3d at 35 (stating that the reasonableness of the defendant's expectations and whether the defendant contributed to the mistake are critical factors in a due process claim). Indeed, peti-

tioner's claim is even stronger because, unlike the defendant in *King*, who could have told the court that it was relying on a repealed statute, petitioner could not have warned me of my "mistake." Finally, the BOP's attempt to apply its new sentencing policy retroactively raises additional constitutional concerns under the Ex Post Facto clause. *See United States v. Serpa*, 251 F.Supp.2d 988 (D. Mass. 2003) (granting downward departure to obviate ex post facto concerns where defendant pled guilty based on legal understanding he could serve sentence at CCC, which OLC memorandum, released between plea and sentencing dates, rendered erroneous); *see also Iacaboni*, 251 F.Supp.2d 1015, 1040–41; *Byrd v. Moore*, 252 F.Supp.2d 293, 305 (W.D.N.C.2003) (citing *Ashkenazi v. Attorney General of the United States*, 246 F.Supp.2d 1 (D.D.C.2003)); *Culter*, 241 F.Supp.2d at 24 n. 6; *cf. In Re Medley*, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890) (holding that a new law that required solitary confinement for prisoners sentenced to death could not be applied to inmate sentenced before the law was enacted).

possible designation to a community confinement facility. The offenders were all placed in a much worse position than they would have been in had the sentencing proceeding not been shrouded in the fog of this supposed error. Certainly, had defendants and their attorneys known that, in fact, no possibility existed that these petitioners would be designated to community confinement, their arguments at the sentencings would have been quite different. The distortion of the sentencing proceeding caused by the error was fundamental. Without the mistaken assumption I had been led into, the substantive arguments before me would have been different, and there is every likelihood the sentences would have been different. Few fact patterns could offer a clearer example of a violation of due process.

251 F.Supp.2d 1015, at 1042–43. In sum, *Addonizio* is no bar to relief under § 2255 in the present case.

■ The government next contends that the record does not support petitioner's argument that, but for the false information regarding CCC placement, I would have granted her downward departure motion. The government quotes my statement at the sentencing hearing: "But because its close and I am not totally convinced that it's quite strong enough [of a] case to depart, and I think the same purpose can be accomplished in another way without requiring the departure, I am going to deny the motion to depart." (10/4/02 Tr. at 4.)

■ This argument is also unconvincing. A "sentence must be set aside where

the defendant can demonstrate that false information formed *part* of the basis for the sentence." *U.S. v. Rone*, 743 F.2d 1169, 1171 (7th Cir.1984) (emphasis added). In other words, petitioner need not show that "but for" the materially false information the sentence would have been different. *Cf. Tucker*, 404 U.S. at 448, 92 S.Ct. 589 (reversing where sentence "*might* have been different had the sentencing judge known that at least two of the respondent's previous convictions had been unconstitutionally obtained") (emphasis added). The transcript reveals that I denied the motion because I was not "totally convinced" that the evidence was strong enough *and* because the goal of the departure could be accomplished without departing. Thus, the sentence was based, at least in part, on mistaken information. The law requires no more.

■ Further, the misinformation was particularly important to the sentencing decision in the present case. Departures based on family circumstances, unlike other types of departures, are granted to avoid "third party harm." *United States v. Norton*, 218 F.Supp.2d 1014, 1019 n. 2 (E.D.Wis.2002). In other words, the court departs not because the defendant with a family is less culpable than one without but rather to protect vulnerable family members from unnecessary harm and deprivation. *United States v. Martinez–Alvarez*, 256 F.Supp.2d 917, 919 (E.D.Wis.2003). In the present case, the misinformation about CCC placement caused me to believe that petitioner's parents would be protected without departing.[5] This mistaken belief was an important ingredient in the decision not to depart. The decision

---

**5.** In *Iacaboni*, 251 F.Supp.2d 1015, 1022, Judge Ponsor discussed the importance of CCC placement to families:

[T]he advantages of community confinement to defendants constitute only a fraction of their particular usefulness. For innocent third parties, particularly children,

the economic and emotional devastation caused by a parent's distant incarceration can be, to some extent, palliated. With the inmate employed, families can stay off welfare; with a parent available, children can avoid placement in foster homes.

would likely have been different had I known petitioner would be sent to a prison.

The government next argues that there was no due process violation because the BOP did not enact a "new rule" but merely corrected a prior, erroneous interpretation of the law. The government claims that this change in policy was foreseeable because several appeals courts had held that community confinement was not "imprisonment" under the guidelines.[6] This argument also fails. Petitioner's sentence was based not only on the BOP's longstanding policy but also on its specific assurance regarding petitioner. Moreover, the change in policy was entirely unforeseeable. *See Mallory v. United States*, No. 03–10220, 2003 WL 1563764, at *1, 2003 U.S. Dist. LEXIS 4522, at *2 (D.Mass. Mar.25, 2003) ("The new rule reflected a sea change in settled understandings concerning the exercise of discretion by the Bureau of Prisons."). For many years, the BOP stated both in Program Statements and in its manual for federal judges that CCC placement was available if recommended by the court. *Iacaboni*, 251 F.Supp.2d 1015, 1026. As Judge Huvelle said, "the idea that petitioner could not have served her full sentence in a halfway house was simply not a possibility at the time that she was sentenced." *Culter*, 241 F.Supp.2d at 22.

The cases cited by the government certainly did not forecast this dramatic change in policy. Those decisions did not even address the BOP's authority to designate a place of confinement. Rather, they concerned the court's authority to fashion a sentence under the guidelines. The BOP's authority to place prisoners is set forth by Congress in 18 U.S.C. § 3621(b),[7] not by the Sentencing Commission in the guidelines. As Judge Brady explained:

> If the Sentencing Commission has no authority to constrain the Bureau, then judicial opinions interpreting the meaning of the Guidelines as they apply to the courts are irrelevant. These opinions address the question whether "community confinement" is "imprisonment" within the meaning of the Guidelines. It is a separate question whether community confinement is a form of imprisonment under a statute that fleshes out the concept of "place of imprisonment" by using the term "any penal or correctional facility." Hence, the OLC, and subsequently, the Government, were mistaken to rely so heavily for their interpretation on these decisions.

*Howard*, 248 F.Supp.2d 518, 543–44; *see also Iacaboni*, 251 F.Supp.2d 1015, 1033–34; *Ferguson*, 248 F.Supp.2d 547, 553–54, 569–71.[8] Thus, contrary to the govern-

---

**6.** In making this argument the government cites the same cases as the OLC memorandum: *United States v. Adler*, 52 F.3d 20 (2d Cir.1995); *United States v. Swigert*, 18 F.3d 443 (7th Cir.1994); *United States v. Serafini*, 233 F.3d 758 (3d Cir.2000); *United States v. Jalili*, 925 F.2d 889 (6th Cir.1991); *United States v. Voda*, 994 F.2d 149 (5th Cir.1993); and *United States v. Latimer*, 991 F.2d 1509 (9th Cir.1993).

**7.** Section 3621(b) provides: "The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health

and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable ...."

**8.** In *United States v. Elkins*, 176 F.3d 1016 (7th Cir.1999), the court acknowledged the limitation of *Swigert* and like-cases. "This Court has repeatedly held that imprisonment, *at least in the context of the Guidelines*, denotes time actually spent in a penal institution." *Id.* at 1020 (internal quote marks omitted, emphasis added, citing *Swigert* and other cases).

ment's contention, the OLC memorandum did not bring the BOP into step with uniform judicial precedent. Indeed, there are *no* cases holding that the BOP lacks statutory authority to place an offender sentenced to a term of imprisonment in a CCC. *Iacaboni*, 251 F.Supp.2d 1015, 1033.[9]

Finally, the government notes that even without the OLC memorandum the BOP was free to disregard my recommendation for CCC placement. It is true that the district court cannot designate the place of confinement; that task falls to the BOP in light of its expertise and in the exercise of its discretion. *See Byrd*, 252 F.Supp.2d 293, 300. But the BOP did not exercise discretion here. Rather, it decided as a matter of law that no Zone C or D offender may be placed in a CCC regardless of her characteristics, the nature or the offense, or the recommendation of the sentencing judge. This is precisely the opposite of discretion. *See Iacaboni*, 251 F.Supp.2d 1015, 1037–38; *see also Byrd*, 252 F.Supp.2d 293, 302 ("The only way the BOP can properly foreclose places of im-

prisonment is by consideration of the factors listed in 18 U.S.C. § 3621(b) and by consulting its institutional expertise."). The government does not argue, nor could it, that the BOP *would* have assigned petitioner to a prison absent the OLC memorandum. As noted, at the time I imposed sentence the BOP assured me that petitioner would be placed at Parson's House.[10]

In sum, none of the government's arguments are convincing. Therefore, I find that petitioner has established a due process violation.[11]

## III. CONCLUSION

Petitioner's "sentence was imposed in violation of the Constitution." 28 U.S.C. § 2255, ¶ 1. Section 2255, ¶ 2 provides that upon such a finding "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." The appropriate remedy here is to vacate petitioner's

9. In *Iacaboni*, Judge Ponsor reviews in detail each of the cases relied upon by the government and the OLC. *Id.* at 1030–33. I need not repeat his thorough discussion here; suffice it to say that none of the cases stands for the proposition that the BOP cannot place an offender in a CCC.

10. This fact distinguishes the present case from *Borgetti v. Bureau of Prisons*, No. 03–C–50034, 2003 WL 743936 (N.D.Ill. Feb.14, 2003), upon which the government relies. In any event, in light of longstanding BOP policy, I must disagree with the *Borgetti* court's statement that "the chance that the BOP would not accept this court's recommendation that Borgetti be placed in a work release facility remained a very real and distinct possibility." *Id.* at *2. I also note that in most of the other cases in which courts denied relief to defendants complaining of lost CCC placement because of the OLC memorandum, the judge stated that the possibility of CCC placement was not part of the sentencing calculus. *See, e.g., United States v. Kramer*, No. 02–CR–

47, 2003 WL 1964489, at *4 (N.D.Ill. Apr.28, 2003) (rejecting defendant's due process claim because the court "would have imposed exactly the same sentence even if the former policy of CCC designation had not existed. Thus, Kramer's sentence was not tainted by any material misinformation of constitutional magnitude."); *United States v. Schild*, No. 00–40021, 2003 WL 260672, at *3, 2003 U.S. Dist. LEXIS 1703, at *6 (D.Kan. Jan. 21, 2003) (stating that "even if the court had known that defendant would not qualify for work release, the court would have issued the same sentence. In other words, the alleged 'misinformation' was not 'material.' ").

11. Because I resolve petitioner's motion on due process grounds I need not rule on whether the OLC's analysis of the BOP's authority with respect to CCC placement is correct. In *Iacaboni*, 251 F.Supp.2d 1015, Judge Ponsor persuasively explains why OLC is mistaken. *See also Howard*, 248 F.Supp.2d 518, 536–46; *Byrd*, 252 F.Supp.2d 293, 300–02.

sentence and conduct another sentencing hearing in light of the new BOP policy. Petitioner may re-submit her downward departure request and the government may respond as it deems appropriate.

**THEREFORE, IT IS ORDERED** that petitioner's motion is **GRANTED** and her sentence is **VACATED.**

**IT IS FURTHER ORDERED** that petitioner will be re-sentenced on ***Friday, June 20, 2003, at 10:30 a.m.*.* Petitioner shall file any request for a downward departure no later than ***June 2, 2003,*** and the government may submit a written response to petitioner's downward departure motion no later than ***June 13, 2003.***