Zalmen ASHKENAZI Plaintiff,

v.

ATTORNEY GENERAL OF THE UNITED STATES, et al. Defendants.

No. CIV.A.03–062 (GK).

United States District Court, District of Columbia.

Feb. 24, 2003.

Alyza Doba Lewin, Washington, DC, Nathan Lewin, Lewin & Lewin, LLP, Washington, DC, for Plaintiff.

David J. Ball, Jr., Washington, DC, for Defendants.

A.J. Kramer, Office of Federal Public Defender, Washington, DC, Amicus.

### MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiff, Zalmen Ashkenazi, challenges his re-designation by the Bureau of Prisons ("BOP") to a Federal Prison Camp rather than the Community Corrections Center ("CCC" or "halfway house") to which he was originally designated. Plaintiff contends that the re-designation violates the *Ex Post Facto* Clause of the Constitution. On January 22, 2003, the Court appointed the Federal Public Defender for the District of Columbia as *amicus curiae*. Defendants are the Attorney General of the United States and the Director of the BOP.

This matter is now before the Court on Plaintiff's Motion for a Preliminary Injunction. Upon consideration of the Motion, Opposition, Reply, the arguments present-

ed at the motions hearing on February 10, 2003, and the entire record herein, for the reasons stated below, Plaintiff's Motion for a Preliminary Injunction is **granted.**

## I. BACKGROUND

On January 31, 2001, Plaintiff was charged in a four-count indictment in the United States District Court for the Southern District of New York with conspiracy to commit bank fraud, 18 U.S.C. § 371, and bank fraud, 18 U.S.C. § 1344. The offense, which involved $133,999 in "kited" certified checks, was committed between December 1997 and February 1998.

The prosecutor offered Plaintiff a plea bargain under which he would be sentenced as a Level 13 offender but would agree not to seek a downward departure. Plaintiff accepted this plea offer, which placed him in "Zone D" of the Sentencing Guidelines. Plaintiff pled guilty to the conspiracy count of the indictment on May 30, 2002.

At the time Plaintiff accepted the plea offer and pled guilty, and during the seventeen years preceding his plea, the BOP could, in its discretion, designate defendants who were in Zones C or D of the Sentencing Guidelines, such as Plaintiff, to serve their full sentences, or any portions thereof, in a CCC rather than a federal prison. Plaintiff was advised of this well-established policy by his attorney, an experienced New York City criminal defense lawyer, and accepted the plea offer with the expectation that the BOP would use its discretion to determine whether he should serve his sentence in a halfway house.

Plaintiff was sentenced on October 15, 2002. The Probation Office recommended to the sentencing judge that Ashkenazi serve four months, and that the full sentence be served in a CCC. As justification for this recommendation, the Probation Office relied on Ashkenazi's lack of criminal history, his "instrumental" role in caring for his wife, who "suffered life threatening injuries in a car accident . . . [for which] she still has to undergo surgery," and in easing the burden on his wife by caring for their children. Presentence Investigation Report in *United States v. Ashkenazi*, S.D.N.Y., No. 01 CR 796(SHS), dated August 20, 2002, Pl.Ex. 1 at 21. The judge sentenced Plaintiff to twelve months and one day of imprisonment, and recommended to the BOP that he serve seven months of that sentence in a CCC. On December 6, 2002, the BOP instructed Ashkenazi to surrender to the Brooklyn CCC for service of his sentence.[1] He did so, as directed, on December 16, 2002.

On that same day, the Deputy Attorney General advised the BOP that its longstanding policy of interpreting the term "imprisonment" to encompass CCCs was unlawful, and that it no longer possessed the discretion to designate Zone C and D offenders to CCCs. In addition to applying this policy prospectively, the BOP was directed to "transfer to an actual prison facility all federal offenders currently residing in a CCC who, as of [December 16, 2002], have more than 150 days remaining on the imprisonment component of their sentence." Dec. 16, 2002 Memorandum

---

1. Throughout the briefing of this Motion and the motions hearing, it was not clear whether this instruction to Plaintiff reflected a BOP discretionary decision that Plaintiff should serve his full sentence in a CCC. Such a determination would have been reasonable given the recommendation of the Probation Office, Ashkenazi's lack of criminal history, and his family obligations. Subsequent to the motions hearing, Defendants produced a letter, dated November 1, 2002, which suggests that the BOP mistakenly believed that the sentencing judge recommended that Plaintiff serve his full sentence in a CCC. *See* Nov. 1, 2002 Letter from Robert Manco to James Fox.

from Larry D. Thompson to Kathleen Hawk Sayer.

Pursuant to this directive, Ashkenazi was advised on December 23, 2002 that he would be re-designated to a federal prison. On January 10, 2003, he was told to report to the Federal Prison Camp at Fort Dix, New Jersey on January 24, 2003.

On January 16, 2003, Plaintiff filed Motions for a Temporary Restraining Order and for a Preliminary Injunction, seeking to temporarily and permanently enjoin Defendants from re-designating and transferring him from the Brooklyn CCC to the Federal Prison Camp at Fort Dix, or to any other "prison or jail institution." Compl. at 6. Pursuant to an agreement between the parties to facilitate briefing and consideration of the Motion for a Preliminary Injunction, the BOP agreed to defer the date of Plaintiff's transfer until February 24, 2003,[2] and the parties withdrew the Motion for a Temporary Restraining Order.[3]

On February 3, 2003, Defendants filed a Motion to Dismiss, alleging that Plaintiff failed to exhaust his administrative remedies, and that the application to Plaintiff of BOP's new policy does not violate Plaintiff's right to due process under the Fifth Amendment, principles of equitable estoppel, nor the Eighth Amendment's prohibition against cruel and unusual punishment. On February 7, 2003, the Federal Public Defender, as *amicus curiae*, filed a Memorandum in Support of Plaintiff's Application for a Preliminary Injunction and an Order in the Nature of Mandamus, contending that BOP's policy change contravenes Congress' statutory directive, misinterprets the Sentencing Guidelines, and violates Plaintiff's right to due process, equal protection, principles of equitable estoppel, the *Ex Post Facto* Clause, and the Administrative Procedure Act.[4]

## II. ANALYSIS

The District of Columbia applies a traditional four-part test for determining whether to grant a request for a preliminary injunction. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–12, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C.Cir.1987). The movant must establish that (1) he has substantial likelihood of success on the merits; (2) he would suffer irreparable injury if the injunction is not granted; (3) an injunction would not substantially injure other interested parties; and (4) the public interest would be furthered by the injunction. *Dodd v. Fleming*, 223 F.Supp.2d 15 (D.D.C.2002).

### A. Plaintiff Has a Substantial Likelihood of Success on the Merits of the *Ex Post Facto* Claim

Plaintiff's principal argument in support of his Motion for a Preliminary Injunction

**2.** The Court much appreciates the parties' recognition of the importance of the issues raised herein, as well as competing claims on the Court's time.

**3.** Plaintiff subsequently filed a second Motion for a Temporary Restraining Order on February 18, 2003. This Motion seeks to temporarily enjoin Defendants from transferring him until the Court conducts an evidentiary hearing and oral argument concerning the November 1, 2002 BOP letter suggesting that it misunderstood the sentencing judge's recommendation. Because the Court concludes that the retroactive application to Plaintiff of the new BOP policy violates the *Ex Post Facto* Clause, irrespective of the BOP's intent in designating Plaintiff to a CCC, the Court need not conduct an evidentiary hearing on that matter.

**4.** Because only the *ex post facto* claim raised by Plaintiff in his Motion for a Preliminary Injunction has been fully briefed, the Court will not consider, at this time, the additional arguments raised by Defendants and the Federal Public Defender.

is that the retroactive application of the new BOP policy violates the *Ex Post Facto* Clause of the Constitution.[5] The Supreme Court has explained that the presumption against the retroactive application of new laws is "an essential thread in the mantle of protection that the law affords the individual citizen. That presumption is 'deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.'" *Lynce v. Mathis*, 519 U.S. 433, 439, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)).

The specific prohibition on *ex post facto* laws is one aspect of the "broader constitutional protection against arbitrary changes in the law." *Id.* at 440, 117 S.Ct. 891. To fall within the *ex post facto* prohibition, a law must be "retrospective—that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it.'" *Id.* at 441, 117 S.Ct. 891 (quoting *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)).

For the reasons the Court will explain *infra*, the Court concludes that there is a substantial likelihood that the retroactive application of the new BOP policy violates the *Ex Post Facto* Clause of the Constitution. A significant factor motivating Plaintiff to accept the plea agreement was his expectation that he was eligible to serve his sentence in a CCC and that the BOP would exercise its long-standing discretion, as it had for the past seventeen years, to determine whether he should be placed in a halfway house. Pursuant to the Supreme Court's holdings in *Lynce* and *Weaver*, the retroactive alteration of this discretionary placement authority implicates the *ex post facto* prohibition because a substantial factor affecting Plaintiff's decision to plead guilty has now been eliminated as a matter of law. Because this change in policy was not foreseeable, its retroactive application violates the *Ex Post Facto* Clause.

### 1. Applicable Supreme Court Precedent

■ It is clear that the change in BOP policy operates retroactively. It applies to an offense that was committed three years and ten months before the new policy was announced, and to a guilty plea and pronouncement of sentence that occurred six and two months, respectively, before the change in policy was implemented.

Defendants maintain that the new BOP policy does not constitute punishment, and therefore does not "disadvantage" Ashkenazi. They argue that confinement in a halfway house does not amount to punishment because the location of confinement is not part of the sentence imposed by the court.[6] They further maintain that the *Ex*

5. Plaintiff also argues in his Motion for a Preliminary Injunction that the retroactive application of the BOP policy violates the terms of his plea agreement. Because the Court concludes that Plaintiff has a substantial likelihood of success on the merits of the *ex post facto* claim, it need not address that argument.

6. Defendants rely on the distinction drawn in *Milhouse v. Levi*, 548 F.2d 357, 364 (D.C.Cir. 1976), between restrictions on an inmate imposed by the sentencing court, and administrative regulations that are not an "integral part of the sentencing procedure." *Id.* The *Milhouse* court concluded that the latter regulations were not an element of punishment attached to an inmate's initial conviction, and therefore were not subject to the constitutional prohibitions against *ex post facto* laws. As addressed *infra*, the Supreme Court subsequently rejected this distinction in *Lynce* and *Weaver*. Moreover, anyone who has experienced, or even personally observed, the conditions of a prison, as compared to those in a halfway house, could not reasonably contend

*Post Facto* Clause is not implicated because Plaintiff did not have a *guarantee* that BOP would place him in a CCC when he agreed to plead guilty.

Contrary to Defendants' contention, the Supreme Court has twice concluded that comparable changes in two state statutes did constitute violations of the *Ex Post Facto* Clause. In *Lynce,* the Supreme Court unanimously concluded that the retroactive cancellation of "early release credits" awarded to alleviate prison overcrowding violated the *Ex Post Facto* Clause.

In so doing, the majority opinion rejected the government's argument that the new law was constitutional because the change in early release credits was not related to the original penalty assigned to the crime. Relying on its prior ruling in *Weaver,*[7] the Supreme Court reasoned that "retroactive alteration of parole or early release provisions, like the retroactive application of provisions that govern initial sentencing, implicates the *Ex Post Facto* Clause because such credits are 'one determinant of petitioner's prison term ... and ... [the petitioner's] effective sentence is altered once this determinant is changed.'" *Id.* at 445, 117 S.Ct. 891 (quoting *Weaver,* 450 U.S. at 32, 101 S.Ct. 960). The Court recognized the reason "removal of such provisions can constitute an increase in punishment," is that "a 'prisoner's *eligibility* for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed.'" *Id.* at 445–46, 101 S.Ct. 960 (quoting *Weaver,* 450 U.S. at 32, 101 S.Ct. 960) (emphasis added).

Moreover, the *Lynce* Court rejected as irrelevant the fact that the petitioner could not have reasonably expected to receive the early release credits when he pled guilty. It reasoned that the *Ex Post Facto* Clause was violated because the petitioner was "unquestionably disadvantaged" by the new law, which "made ineligible for early release a class of prisoners who were previously eligible." *Id.* at 446, 117 S.Ct. 891.

Thus, the Supreme Court's conclusions in *Lynce* and *Weaver,* holding unconstitutional the retroactive loss of factors affecting a defendant's decision to plea bargain, strongly support Ashkenazi's claim. It is irrelevant that the location of Ashkenazi's confinement was not an "integral part of the sentencing procedure." As the *Weaver* and *Lynce* rulings explained, the *Ex Post Facto* Clause is implicated because a factor affecting Ashkenazi's prison term has changed, and that factor was significant in his decision to accept the plea offer. Ashkenazi accepted the plea with the undisputed and, for him essential, understanding that the BOP would exercise its discretion, as it had for the past seventeen years, to determine the appropriate location for his confinement. As a result of the Justice Department directive, the BOP was no longer permitted to exercise that discretion and was forced to re-designate Plaintiff to a prison facility. Consequently, Plaintiff's punishment was increased because he was no longer eligible to serve his sentence in a CCC, as he had been when he accepted the plea offer.

that there is no difference in "punishment" between the two facilities.

7. The *Weaver* Court also unanimously concluded that retroactively decreasing the amount of "gain-time" awarded for an inmate's good behavior violated the *Ex Post*

*Facto* Clause. *Weaver,* 450 U.S. at 32, 101 S.Ct. 960. "Gain-time credits" reward prisoners for good conduct by using a statutory formula that reduces the length of the sentence they must serve. *Id.* at 25, 101 S.Ct. 960.

Just as it was irrelevant in *Lynce* that the petitioner did not have a reasonable expectation of receiving the early release credits at the time he pled guilty, so it is irrelevant here that Ashkenazi had no guarantee that BOP would determine that he should serve his full sentence in a CCC. As in *Lynce*, Ashkenazi has been "unquestionably disadvantaged" by the new BOP policy. As a result of this policy, Ashkenazi is now ineligible, not only to have the BOP exercise its discretion to determine where to place him, but to actually serve his sentence in a halfway house.

### 2. Administrative Agency Violation of *Ex Post Facto* Clause

Defendants further contend that, even if Plaintiff's transfer from the CCC to a federal prison constitutes "punishment," the *Ex Post Facto* Clause is not implicated because the former BOP policy was unlawful, and the new policy merely serves to correct BOP's prior erroneous interpretation of the law. They rely on *Davis v. Moore*, 772 A.2d 204, 217 (D.C.2001), for the proposition that an agency misinterpretation of a statute cannot support an *ex post facto* claim because a plaintiff does not have a "vested right" in such an erroneous interpretation. In that case, the D.C. Court of Appeals concluded that retroactively depriving inmates of "street time credit" following revocation of parole did not violate *ex post facto* laws.

Initially it must be noted, with no disrespect to the D.C. Court of Appeals, that *Davis* is not binding on this Court. Moreover, there is no similar controlling precedent in this Circuit governing this case.

As to the merits, the *Davis* court's emphasis on whether the inmates had a "vested right" in the erroneous interpretation of the law was clearly rejected by the Supreme Court in *Weaver*. The Supreme Court concluded that "a law need not impair a 'vested right' to violate the *ex post facto* prohibition." *Weaver*, 101 S.Ct. at 964. Instead, the Court emphasized that it is the "lack of fair notice" that is critical to relief under the *Ex Post Facto* Clause. *Id.* at 965.[8]

Relying on the *Weaver*'s court's emphasis on "fair notice," numerous other courts have concluded that the *ex post facto* prohibition applies to administrative rules that purport to correct or clarify a misapplied existing law, provided the new rule was not foreseeable.[9] *See Smith*, 223 F.3d at

---

**8.** In addressing the *ex post facto* claim, the *Davis* court did not consider whether the inmates had sufficient notice. The court did, however, consider the foreseeability of the new rule when considering the inmates' due process claim. Its findings in that regard are readily distinguishable, addressed *infra*, from the circumstances in this case.

**9.** Courts have also concluded that, to implicate the *Ex Post Facto* Clause, administrative rules must have the effect of substantive law, and must not be merely interpretive. *See United States v. Ellen*, 961 F.2d 462, 465 (4th Cir.1992) (using definition of "wetlands" from subsequently adopted federal manual does not violate *ex post facto* prohibition because revised agency definition was interpretive, rather than legislative); *Knox v. Lanham*, 895 F.Supp. 750, 756 (D.Md.1995) (retroac-

tive agency rule removing inmates to higher security classification violates *Ex Post Facto* Clause because inflexible and non-discretionary rule was not merely interpretive). Interpretive rules, as opposed to substantive laws, have been defined as "merely guides, [which] ... may be discarded where circumstances require." *Ellen*, 961 F.2d at 465. Whether the agency itself characterizes the new rule as interpretive "cannot be accepted as conclusive because such a result would enable the [agency] to make substantive changes in the guise of clarification." *Smith v. Scott*, 223 F.3d 1191, 1195 (10th Cir.2000).

Here, it is clear that, irrespective of the BOP's characterization of its policy, the new policy has the force of law and is not merely interpretive. The policy explicitly applies to all inmates who were designated to CCCs

1194–95 (retroactive agency rule rescinding "earned time credits" violates *Ex Post Facto* Clause because new rule was substantive and not foreseeable); *Knuck v. Wainwright,* 759 F.2d 856, 858 (11th Cir. 1985) (retroactive change in methods of calculating "gain time" for inmates violates *Ex Post Facto* Clause because statute on which new agency regulation was based was sufficiently ambiguous); *Love v. C.J. Fitzharris,* 460 F.2d 382, 385 (9th Cir. 1972) (retroactive change in interpretation of statute concerning parole date violates *Ex Post Facto* Clause where agency interpretation was not subject to judicial review), *vacated as moot,* 409 U.S. 1100, 93 S.Ct. 896, 34 L.Ed.2d 682 (1973) [10]; *Piper v. Perrin,* 560 F.Supp. 253, 257–58 (D.N.H. 1983) (retroactive change in method by which "good conduct credits" were calculated violates *Ex Post Facto* Clause because new agency rule was not foreseeable).

Here, the change in BOP policy prohibiting it from exercising its discretion to determine a prisoner's place of confinement was not foreseeable. As the Government itself emphasizes, this discretion is explicitly authorized by statute. The statutory provision committing prisoners to the custody of the BOP grants the agency the following discretionary authority:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate *any* available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau ...

that the Bureau determines to be appropriate and suitable, considering——(1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence——(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate.

18 U.S.C. § 3621(b) (emphasis added).

Indeed, the BOP has continually exercised this statutorily prescribed discretion for the past seventeen years. Accordingly, courts have routinely made sentencing recommendations to the BOP, as the sentencing judge did in Ashkenazi's case, with the understanding that, while the BOP had no legal obligation to comply with the court's recommendations, it had full authority to accept——or as in this case reject——such recommendations when it employed its discretion to determine every prisoner's appropriate place of confinement. There is nothing in the statute or BOP's prior implementation of the statute to suggest that this well-known and long-standing policy would be abruptly changed. This case is not like the correction in *Davis* of the statutory interpretation of the D.C. Department of Corrections; that correction was foreseeable given a prior judicial interpretation of the statute as well as the administrative implementation of a similar federal statute by the U.S. Parole Commission.[11]

---

under BOP's prior policy and have more than 150 days remaining on their sentences. The new rule is therefore not flexible and does not permit BOP to exercise any discretion. Accordingly, the policy is equivalent to new legislation for purposes of the *Ex Post Facto* Clause.

**10.** Although *Love* was vacated as moot, it was later cited with approval by the Supreme

Court in *Warden v. Marrero,* 417 U.S. 653, 663, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974).

**11.** Defendants emphasize that Courts of Appeals have previously concluded that courts may not substitute CCCs for prison facilities pursuant to Sections 5C1.1 and 5C2.1 of the Sentencing Guidelines. *See United States v. Adler,* 52 F.3d 20, 21 (2d Cir.1995); *United*

### 3. Recent Administrative Developments

During the motions hearing, Defendants argued, for the first time,[12] that the BOP did in fact reevaluate Plaintiff's placement and determined, in its discretion, that he should serve the first five months of his sentence in a prison facility.[13] They maintain that Plaintiff has not suffered any injury because BOP has effectively applied its former discretionary policy, and, in so doing, determined that the original placement in a CCC was not appropriate.

It is passing strange that there is no documentary evidence——"paper trail" in bureaucratic parlance——that the BOP specifically reconsidered the merits of Plaintiff's placement including the nature of his crime, his risk to society, his lack of prior criminal history, and his family and business obligations. In other words, the Court does not know whether this reconsideration was the same as that given to all offenders affected by the new policy—— namely a determination that, because Plaintiff is a Zone D offender residing in a CCC, who has more than 150 days remaining on the imprisonment component of his sentence, he must be transferred to a prison facility.

Assuming, *arguendo*, that the BOP did specifically reconsider Ashkenazi's placement, it does not contend that this recon-sideration occurred before the Deputy Attorney General issued the December 16, 2002 memorandum advising the BOP that it could no longer employ its discretion to place Zone C and D offenders in CCCs. Thus, in "reconsidering" Plaintiff's placement after December 16, 2002, the BOP had no discretion to exercise and was required by the new Department of Justice policy to conclude that Plaintiff should be placed in a prison facility. To do otherwise, would have violated the Attorney General's explicit prohibition on placing Zone D offenders in CCCs.

However, Plaintiff accepted the plea bargain with the explicit understanding that the BOP would exercise its discretion and that there was a possibility he would serve his sentence in a CCC. Because any reconsideration of his placement after the December 16 memorandum precludes the BOP from exercising this discretion, Plaintiff could not, as a matter of law, receive the consideration he bargained for. In short, the loss of "eligibility" under application of the new policy was the same loss of "eligibility" which the Supreme Court found unconstitutional in *Lynce* and *Weaver*.

Finally, after the Motion for a Preliminary Injunction was fully briefed, Defendants argued, again for the first time, that the BOP's initial designation of Plaintiff to

---

*States v. Swigert,* 18 F.3d 443, 445 (7th Cir. 1994). No court, however, has concluded that the BOP policy of determining, in its discretion, whether a prisoner should serve his sentence in a CCC or prison facility conflicts with the Sentencing Guidelines or is otherwise unlawful. Obviously, there is a difference between a court's sentence and an agency's administrative action.

**12.** Defendants did argue in their Opposition to Plaintiff's Motion for a Preliminary Injunction that "even if this Court were to accept plaintiff's arguments about the BOP's current policy, BOP would remain free under its for-mer policy to act on the sentencing Court's recommendation by transferring plaintiff to a prison facility for the five-month-and-one-day period." Defs. Opp'n to Pl. Mot. for Preliminary Injunction at 2. The Court did not understand this argument to suggest that the BOP had actually reconsidered the merits of Plaintiff's placement.

**13.** It is not clear whether the BOP reevaluated Ashkenazi's placement and determined he should serve only the first five months in a prison facility, or that he should serve his entire sentence in a prison facility.

a CCC instead of a prison facility was the result of an administrative error. They rely on a letter from the Community Corrections Department to the U.S. Probation Department which provides, in relevant part, that

> [Ashkenazi] was sentenced on October 22, 2002, in the Southern District of New York to a 12 month 1 day term of imprisonment, with two years supervised release for Conspiracy to Commit Bank Fraud. The Honorable Sidney H. Stein recommended that Mr. Ashkenazi serve his term of confinement in a community corrections center.

November 1, 2002 Letter from Robert Manco to James Fox.

Even if this letter does establish that the BOP placed Ashkenazi in a CCC because it mistakenly believed it was complying with the judge's sentencing recommendation, that would not alter the unconstitutional nature of the retroactive application of the new BOP policy to Ashkenazi.[14] As addressed above, Plaintiff accepted the plea offer with the expectation that he was eligible to serve his sentence in a CCC and that the BOP would exercise its discretion under the old policy. As a result of the new policy, the BOP is now prohibited from exercising that discretion——the basis on which that expectation rested.

It is irrelevant that a portion of his CCC confinement may have been the result of an administrative error on the part of the BOP. Instead, the critical aspect of the *ex post facto* violation is that the new policy makes Plaintiff ineligible to serve his sentence in a CCC and precludes the BOP from exercising the discretion it had when Plaintiff accepted the plea agreement. In other words, just as the new statute did in

*Lynce*, the new BOP policy here "ma[kes] ineligible for [CCC confinement] a class of prisoners who were previously eligible." *Lynce*, 519 U.S. at 446, 117 S.Ct. 891.

In sum, there is a substantial likelihood that the retroactive application of the new BOP policy violates the *Ex Post Facto* Clause of the Constitution. Pursuant to the Supreme Court's holdings in *Lynce* and *Weaver*, the retroactive alteration of BOP's placement authority implicates the *ex post facto* prohibition because a substantial factor affecting Plaintiff's decision to plead guilty——his eligibility to serve his sentence in a CCC and his expectation that the BOP would exercise its discretion in that regard——has been eliminated as a matter of law. Because this change in policy was not foreseeable, its retroactive application violates the *Ex Post Facto* Clause.

### B. The Balance of Harms Weighs in Favor of Plaintiff

As noted above, to obtain a Preliminary Injunction, Plaintiff must establish not only that he has a substantial likelihood of success on the merits, but also that the balance of harms weighs in his favor. The balance of harms includes consideration of the irreparable injury to Plaintiff, the injury to other interested parties, and the public interest.

First and foremost, it is clear that Plaintiff will suffer irreparable injury if he is transferred from a CCC to a prison. This is particularly true because he will be unable to care for his wife——who suffered life threatening injuries for which she continues to require surgery and on-going medical care——and attend to his business

---

14. The Court cannot, and need not, determine whether the BOP would have designated Ashkenazi to serve his full sentence in a CCC irrespective of the sentencing judge's recommendation.

if he is confined in a federal prison.[15] Moreover, Plaintiff would certainly suffer irreparable harm as a result of confinement in a prison, rather than in a CCC.

Defendants counter that Plaintiff will not suffer any imminent injury because the BOP would merely be complying with the sentencing judge's recommendation by transferring Plaintiff to a CCC for the first five months of his sentence. However, Plaintiff's injury is not dependent on whether his sentence complies with the sentencing judge's non-binding recommendation. Rather, his injury is a consequence of BOP's inability to exercise its discretion and place him in the facility it believes is most appropriate.

With respect to injury to other interested parties, Defendants will not be substantially injured by a delay in Plaintiff's transfer. While Defendants certainly have an interest in obtaining the appropriate level of confinement for offenders, the BOP has been placing Zone C and D offenders in CCCs for seventeen years. Obviously, given that history, a delay pending resolution of the merits of Plaintiff's claim will not cause substantial injury to Defendants.

Plaintiff's wife, children, and nineteen employees, on the other hand, will suffer immediate and serious injury. As noted above, Plaintiff's wife suffers from serious injuries, and is unable to adequately care for their children without her husband's assistance. As the sole source of income for their family, Plaintiff's inability to work will also cause irreparable harm to his family. Further, the nineteen employees in Plaintiff's business depend on him to operate the company.

Finally, an injunction will further the public interest. The public certainly has an interest in ensuring that retroactive laws are constitutional. This is particularly true where, as here, the presumption against the retroactive application of new laws has been described by the Supreme Court as "an essential thread in the mantle of protection that the law affords the individual citizen. That presumption is 'deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.'" *Lynce,* 519 U.S. at 439, 117 S.Ct. 891 (quoting *Landgraf,* 511 U.S. at 265, 114 S.Ct. 1483).

Accordingly, the balance of harms weighs in favor of granting Plaintiff's Motion for a Preliminary Injunction. Because Plaintiff also has a substantial likelihood of success on the merits of the *ex post facto* claim, the Court concludes that injunctive relief is appropriate.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction is **granted**.

---

**15.** Plaintiff maintains that not only will his business be harmed, but that his nineteen employees will be adversely impacted as well.