**James E. BYRD, et al., Petitioners,**

v.

**G.O. MOORE, Community Corrections Manager, Raleigh Office, Federal Bureau of Prisons, Respondent.**

No. 3:03–CV–26.

United States District Court,
W.D. North Carolina,
Charlotte Division.

March 6, 2003.

Robert A. Blake, Jr., Charlotte, NC, Peter Goldberger, Law Offices of Alan Ellis, Ardmore, PA, Calvin E. Murphy, Murphy & Chapman, Charlotte, NC, Peter Crane Anderson, C. Christopher Clark, Shumaker, Loop & Kendrick, Charlotte, NC, James Gronquist, Nixon, Park & Gronquist, PLLC, Charlotte, NC, for Petitioners.

## ORDER

MULLEN, Chief Judge.

THIS MATTER comes before the Court upon Petitioners' motion for preliminary injunction and oral motion for stay. The Parties provided the Court with written argument and the Court held a hearing on February 20, 2003. At the hearing, the Court imposed a stay pursuant to its in-

herent powers [1] and, if a stay is inappropriate, a preliminary injunction. The Court, essentially, has entered both a stay, to the extent one is permissible, and a preliminary injunction.

Petitioners ultimately seek a writ of *habeas corpus* or relief in the nature of *mandamus*. Petitioners preliminarily requested a temporary restraining order during the pendency of their application. The Court entered a temporary restraining order with notice, holding for the purposes of the T.R.O. that the balance of harms tilted decidedly in favor of the Petitioners and that they had shown that there were questions going to the merits of the case so serious, substantial, difficult and doubtful as to make them grounds for further litigation. Further, based on the Respondent's failure to brief a number of crucial legal issues, as well as the strength of several of Petitioners' arguments, the Court concluded that the Petitioners had a likelihood of success on the merits.

## I. BACKGROUND

The following are facts to which the parties have stipulated for the purposes of the preliminary injunction and stay proceeding held February 20, 2003.

Petitioner James Byrd pled guilty to one count of mail fraud. On January 25, 2002 he was sentenced "to be imprisoned for a term of fifteen (15) months w/ work release." The Court additionally recommended that he be designated by the Bureau of Prisons to the McLeod Center, a Community Confinement Center (CCC). He reported to the McLeod Center on July 1, 2002 for a sentence that is scheduled to be completed on June 19, 2003.

Petitioner Ebony Guinn pled guilty to one count of conspiracy to interfere with commerce by threat or violence. On March 6, 2002, after receiving a downward departure from a level 17 to a level 12, she was sentenced "to be imprisoned for a term of fifteen (15) months." The Court recommended that she be designated to the McLeod Center. After designation, she reported to the McLeod Center on April 24, 2002 for a sentence that is scheduled to be completed on May 22, 2003.

Petitioner Joseph O'Brien pled guilty to one count of bank fraud. He was sentenced, by Judge Yohn of the United States District Court for the Eastern District of Pennsylvania, to a term of imprisonment totaling 24 months. The Court also recommended that "when eligible," he "be designated to the Federal Halfway House at McLeod Center in Charlotte, North Carolina." He was so designated and reported on May 31, 2002 for a sentence scheduled to be completed on February 24, 2004.

Petitioner Jaron Sturdivant pled guilty to one count of possession of a firearm by a convicted felon. He was sentenced "to be imprisoned for a total term of fifteen (15) months." The Court recommended that he be designated to the McLeod Center. He was so designated and began serving his imprisonment on July 29, 2002, and his sentence is scheduled to be completed on June 27, 2003.

On December 13, 2002, the Office of Legal Counsel (OLC) of the United States Department of Justice rendered an opinion to the U.S. Deputy Attorney General concerning the legality of the Bureau of Prisons' designation of Community Confinement Centers as the place for the service of certain offenders' sentences of imprison-

---

**1.** *See, e.g., Carlisle v. United States,* 517 U.S. 416, 438, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996) ("Examples of the exercise of the federal courts' inherent powers are abundant in both our civil and our criminal jurisprudence.").

ment. The OLC's opinion concluded that the Bureau of Prisons' long practice of so designating such offenders is "unlawful." On December 23, 2002 Respondent notified each of the petitioners in writing that they would be redesignated within 45 days, but not less than 30 days, to another federal correctional institution. On January 10, 2003 Respondent informed each petitioner in writing that he or she had been redesignated to a federal prison camp and each petitioner was ordered to report on or about January 27, 2003. Based on submissions from both parties, it is clear that redesignation as a result of the change in Bureau of Prisons policy applied only to those prisoners who had more than 150 days remaining on their sentence on December 16, 2002.

All four Petitioners are gainfully employed, and, with the exception of Petitioner Byrd, contribute to the support of their respective families.

## II. *HABEAS CORPUS* STAY STANDARD AND APPLICATION

■ There is some question, on the part of Respondent, whether the relief granted in this order is a stay or a preliminary injunction. Title 28 United States Code section 2251 authorizes a Court before which a *habeas corpus* petition is pending to stay any proceeding involving the person detained. It specifically refers to a "person detained in any State court or by or under the authority of any State." The Court believes that it has the inherent power to stay a federal proceeding to allow the Court to "dispose of the matter as law and justice require." 28 U.S.C. § 2243. As the Court has been unable to come to such a lawful and just result summarily as anticipated by § 2243 due to the complexity of the legal issues involved, the Court believes it must stay Petitioners' redesignation pending an expedited opportunity to

address all of Petitioners' claims on the merits.

The standard for granting a stay under § 2251 in a non-capital case is the same as the standard for granting preliminary injunctive relief. *Gilliam v. Foster*, 61 F.3d 1070, 1078 (4th Cir.1995). Looking to § 2251 as a guide, the Court determines that the proper standard for staying a proceeding involving a federal prisoner should be the same. Such a stay is not the same as an injunction. It is derived from a separate and distinct power of the District Court. Here, the Court believes it is necessary, based on the complexity of the legal issues and the necessity to conduct some fact discovery, to stay the Bureau of Prisons' redesignation of Petitioners pending a full and final adjudication of the merits of Petitioners' application. The balance of harms analysis in the following section of this Order applies equally to the *habeas corpus* stay and the preliminary injunction.

## III. PRELIMINARY INJUNCTION STANDARD AND APPLICATION

### A. Standard

■ The standard for issuance of preliminary injunctive relief or a stay in a *habeas corpus* petition is the "balance of hardship" test stated in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977); *Gilliam*, 61 F.3d at 1078; *see also Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir.1991); *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029, 1032 (4th Cir.1980). Before such relief is granted, the Court must consider four factors the first two of which are the most critical:

1) the likelihood of irreparable harm to the Petitioners *without* the temporary injunction;

2) the likelihood of harm to the Respondent *with* the injunction;

3) the Petitioners' likelihood of success on the merits;

4) the public interest.

If, after balancing the first two factors, the balance "tips decidedly" in favor of the Petitioners, a preliminary injunction will be granted if they have "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Blackwelder*, 550 F.2d at 195. In other words, if the harm to the Petitioners greatly outweighs the harm to the Respondent, then enough of a showing has been made to permit the issuance of an injunction. But, as the harm to the Petitioners decreases, when balanced against the harm to the Respondent, the likelihood of success on the merits becomes more important. *Telvest*, 618 F.2d at 1032–33. Likelihood of success on the merits alone, however, without any showing of a risk of irreparable harm, is not sufficient to warrant the issuance of a preliminary injunction since Petitioners must always show some risk of probable irreparable injury. *Blackwelder*, 550 F.2d at 196. Therefore, as the balance of the first two factors tips away from the Petitioners, a stronger showing on the merits is required. *Telvest*, 618 F.2d 1029.

B. Balance of Harms

■ In applying the *Blackwelder* analysis to the present case, the Court must first examine the relative harms of the parties. In both his written argument and at the hearing, the Respondent conceded that Petitioner's exposure to irreparable harm is far greater than any harm the Respondent might suffer as a result of the stay or preliminary injunction. In fact, in his written submission, Respondent argues that Petitioners fail to satisfy the *Black-welder* test not because the Respondent will suffer greater or even comparable harm, but rather because "it is not legally possible for petitioners to succeed on the merits of their underlying claims." Respondent has surrendered the field in the balance of harms, and relies solely on his contention that Petitioners' legal arguments are wholly without merit.

Despite its belief the Respondent has conceded that Petitioners' probability of irreparable harm far exceeds that of Respondent, the Court holds, for the purposes of the stay and preliminary injunction, that Petitioners have made a "strong showing" of a very real probability of irreparable harm without the stay or preliminary injunction. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir. 2002). All four are currently employed while on work release and all but one are helping support their respective families. Each has an interest in maintaining that employment and staying out of a penal or correctional facility that would necessitate the termination of it. The Petitioners have also been able to maintain some involvement in their community, thereby rehabilitating themselves and their reputations. Transfer from the McLeod Center would irreparably harm these interests. Further, as the Court will discuss in greater detail *infra*, the Petitioner's have presented colorable, and in some cases strong, claims that their rights under the Administrative Procedures Act and a number of constitutional clauses would be violated by application of the new Bureau of Prisons' policy to them. Violation of these rights would constitute irreparable harm of the first order. The Respondent, on the other hand, has presented no evidence of any harm that might follow from the grant of a stay or preliminary injunction. In fact, Respondent and the Bureau of Prisons have operated under the old interpretation and policy since 1987 without any problem.

The Court, therefore, concludes for the purposes of this stay and preliminary injunction that the balance of harms tips decidedly in favor of the Petitioners.

### C. Likelihood of Success on the Merits

Next, the Court must examine Petitioners' likelihood of success on the merits. As noted above, *Blackwelder* requires that the first two factors (the relative harms) be given the most weight in the Court's analysis. Because the balance of harms tilts so decidedly in favor of the Petitioners, they need only "raise[ ] questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Blackwelder*, 550 F.2d at 195. This Petitioners have certainly done with respect to each of their legal arguments examined in this Order. However, the Court concludes that they have exceeded this requirement. Petitioners have, in fact, demonstrated a likelihood of success on the merits of a number of their legal contentions.

The Petitioners have pointed to a number of persuasive legal arguments relating to application of the Bureau of Prisons policy change. Petitioners' first two arguments challenge the validity of the new BoP interpretation of 18 U.S.C. § 3621 and the resulting policy change. The rest assume *arguendo* that the BoP interpretation of the law is correct, but nevertheless challenge the retroactive application of it to them. All require additional examination through full litigation of the application for writ of *habeas corpus* or relief in the nature of *mandamus*.

i. The Bureau of Prisons is operating under a mistaken interpretation of law relief for which is available under the Administrative Procedures Act and *Habeas corpus*

 Petitioners' primary argument is that the Bureau of Prisons' new interpretation of the applicable law is erroneous, and that their redesignation in reliance on that mistaken interpretation of law is actionable under 28 U.S.C. § 2241 and the Section 706(2)(C) of the Administrative Procedures Act. *Habeas corpus* under 28 U.S.C. § 2241 lies to correct administrative error when the nature of a Petitioner's custody is affected. *Ralston v. Robinson*, 454 U.S. 201, 102 S.Ct. 233, 70 L.Ed.2d 345 (1981); *Lopez v. Davis*, 531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001); *Pelissero v. Thompson*, 170 F.3d 442 (4th Cir. 1999). The prior interpretation of the relevant statute, 18 U.S.C. § 3621(b), has been accepted by Congress and the Sentencing Commission, relied upon by sentencing judges, and noted with approval by the Supreme Court. Petitioners argue that the new interpretation of the statute cannot stand if one looks to the statute at issue and applies the normal tools of statutory construction.

 The determination of whether an agency interpretation of law is valid is a two-step process. First, the Court must decide whether "the intent of Congress is clear." *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) If so, that is the end of the inquiry. *Id.* If not, the Court must decide what deference should be given to the agency interpretation. *Id.* at 843, 104 S.Ct. 2778. Petitioners contend that the statute is clear and unambiguous so the BoP interpretation should not be given any deference as the Court and the BoP must give effect to the clear intent of Congress. However, even a reasonable policy statement issued by an agency is entitled to some deference, *Reno v. Koray*, 515 U.S. 50, 60, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) ("BOP's internal agency guideline

... is still entitled to some deference...."), if not the entirety of *Chevron* deference. Essentially, the Court must conduct a "reasonableness" analysis of the BoP interpretation.

For a number of reasons the Court concludes that Petitioners have established a likelihood of success on the merits of this claim and that they certainly have "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Blackwelder*, 550 F.2d at 195. First, a sister Court has relied on this argument in enjoining application of the new BoP policy to a Petitioner similarly situated to the Petitioners in this case. *Howard v. Attorney General Ashcroft*, 248 F.Supp.2d 518 (M.D.La. 2003). This is highly persuasive for the Court when deciding that the question deserves more detailed consideration on the merits.

Second, the Court simply believes that the BoP's new policy is likely based on an invalid interpretation of the relevant statute. The Bureau of Prisons is given custody of those sentenced to a term of imprisonment. 18 U.S.C. § 3621(a). Next the BoP is directed to imprison such a person in a suitable place. Title 18 United States Code section 3621(b) provides that "[t]he Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate *any available penal or correctional facility* that meets minimum standards of health and habitability established by the Bureau." 18 U.S.C. § 3621(b) (emphasis added). The BoP is authorized to release prisoners to work in the community "while continuing in official detention at the penal or correctional facility." 18 U.S.C. § 3622(c). The issue is simply whether the McLeod Center is a "penal or correctional facility" for the pur-

poses of § 3621(b). Based on the ordinary meaning of these terms, the Court must find that there is a likelihood that the BoP's interpretation of § 3621(b), which concludes that the McLeod Center is not a "penal or correctional facility," will likely not withstand review by this Court under 18 U.S.C. § 2241 or the APA. *See Howard*, Civil No. 03–123–D–M3 at 39–40, ———— (examining American and British dictionaries in determining the ordinary meanings of the terms "penal" (of, pertaining to, prescribing, or relating to punishment) and "correctional" (punishment intended to rehabilitate or improve)). On the most basic level, then, the McLeod Center and other CCCs are "penal or correctional facilities." What other purpose do they serve? Even the BoP has assured Congress, in earlier statements, that CCCs are "penal and correctional facilities": "Community correction centers (CCC) provide two program components within their facilities: a pre-release component and a community corrections component ... The community corrections component is designed to be sufficiently punitive to be a legitimate sanction." Joint Report to Congress, United States Sentencing Commission and Federal Bureau of Prisons, *Maximum Utilization of Prisons Resources*, at 9–10 (June 30, 1994).

Section 3621 endows the BoP with considerable discretion to designate prisoners anywhere the BoP decides is appropriate, considering only the five factors listed in § 3621: "1) the resources of the facilty contemplated; 2) the nature and circumstances of the offense; 3) the history and characteristics of the prisoner; 4) any statement by the court that imposed the sentence ...; and 5) any pertinent policy statement issued by the Sentencing Commission...." 18 U.S.C. § 3621(b).[2] Im-

---

**2.** Section 3621(b) also makes reference to

"minimum standards of health and habitabili-

plicit also is the requirement that the BoP consider its institutional expertise in considering what facilities are appropriate. This statute is extremely broad; it rules out almost no imaginable facility or institution, public or privately owned. Rather, it requires the BoP to look at the particulars of the offender and the facility in determining whether a facility is a proper place of imprisonment. Respondent and the BoP seek to find, in the statute, a limitation on that broad discretion that simply does not exist.

Respondent argues that the terms "penal or correctional facility" are limited by the earlier appearance in the state of phrase "place of imprisonment." The addition of the "imprisonment" element, Respondent contends, limits the options that satisfy the "penal or correction facility." The Court is uncertain how requiring housing in a "place of imprisonment" in anyway excludes CCCs. It seems that Respondent would like the Court to read the words "penal or correctional facility" out of the statute. But this the Court cannot do. "Judges should hesitate ... to treat [as surplusage] statutory terms in any setting...." *Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (quoting *Ratzlaf v. United States,* 510 U.S. 135, 140–141, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)). Furthermore, people do not become inmates of CCCs because they want to. While they are able to leave under some limited circumstances as outlined by 18 U.S.C. § 3622, they are not free to come and go as they please. They are "imprisoned." Their liberty is restricted. There are consequences for their failure to follow rules. The Court is not satisfied that the term "imprisonment" requires that all those in the custody of the

BoP must be confined in structures resembling Alcatraz or Sing Sing. Section 3621 certainly does not impose such a limitation on the BoP's discretion.

■ Respondent attempts to bolster his argument that a CCC cannot be a proper place of imprisonment for initial designation because the Sentencing Guidelines, in some situations, require imprisonment and then allow for confinement at a CCC. First, the Sentencing Guidelines quite simply cannot trump a statute. The Guidelines are a set of rules binding only on Judges. They have no applicability to the Bureau of Prisons or its exercise of discretion. So, the argument that the Guidelines in some way require a particular reading of the 18 U.S.C. § 3621 is entirely without merit. The Sentencing Commission is allowed to provide some input to the BoP in its determination of what facilities are appropriate for imprisonment. 18 U.S.C. § 3621(b)(5). The Sentencing Commission has issued no policy statements pursuant to 28 U.S.C. § 994(a)(2) pertaining to CCCs as places of imprisonment. In fact, consideration of the Sentencing Guidelines in determining what facility is an appropriate place of imprisonment may be improper because the Guidelines are not listed among the factors to be considered in designating a place of imprisonment and do not intuitively fit into things an agency should consider it its institutional expertise. 18 U.S.C. § 3621(b).

Additionally, the Respondent's argument ignores the possibility that residence in a CCC can be imprisonment for some offenders and not for others based on the nature of their sentence and consideration of the five factors listed in 18 U.S.C. § 3621(b).

ty" as factors to consider in designating places of imprisonment. Through the rest of this Order, however, the Court will refer principally to the five legal factors contained in that subsection.

For these reasons, Petitioners have met their burden of showing that they have a likelihood of success on the merits with regards to their claim that relief is warranted under the APA and § 2241 because the new BoP policy is premised on an erroneous interpretation of law.

ii. Relief in the nature of *mandamus* is available to compel an exercise of discretion confined within lawful bounds

Petitioners also seek relief in the nature of *mandamus* under 28 U.S.C. § 1361. They ask the Court to compel Respondent to exercise his authority within lawful bounds. Here, Petitioners argue that the new BoP policy renders Petitioners ineligible for a type of imprisonment authorized by statute. *Mandamus* may be appropriate if the BoP policy impermissibly ignores the real legal limitations on BoP discretion. That is, the Bureau of Prisons has interpreted the statute in a manner which limits the possible sites where Petitioners may be imprisoned. "The [officer's] duty may be discretionary within limits. He cannot transgress those limits, and if he does so, he may be controlled by injunction or *mandamus* to keep within them." *Burnett v. Tolson*, 474 F.2d 877, 882 n. 8 (4th Cir.1973) (quoting *Work v. U.S. ex rel Rives*, 267 U.S. 175, 177, 45 S.Ct. 252, 69 L.Ed. 561 (1925)); *see also infra* part III.C.v. If the interpretation, and thus the limitation, are not correct, utilization of the full discretionary spectrum can be compelled by *mandamus*. *Silveyra v. Moschorak*, 989 F.2d 1012 (9th Cir.1993).

Petitioners do not contend, and the Court does not believe, that Petitioners have a right initially to be designated to a CCC. Rather, they have a right to be considered for such designation unless the BoP legitimately determines that CCCs

are not proper "penal or correctional facilit[ies]." They have a right to require that the BoP not act based on what may be an erroneous interpretation of law. In other words, Respondent "has a clear duty" not to improperly foreclose any legally available places of imprisonment. *United States* ex rel. *Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 511 (4th Cir. 1999). The only way the BoP can properly foreclose places of imprisonment is by consideration of the five factors listed in 18 U.S.C. § 3621(b) and by consulting its institutional expertise. The BoP is not permitted to base policy changes on errors of law: to do so would be arbitrary and irrational. There is no evidence that the BoP considered any of the permissible factors in deciding that imprisonment at a CCC was "unlawful." The Court therefore concludes that the Petitioners have met their burden in "rais[ing] questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Blackwelder*, 550 F.2d at 195. And because the Court has previously concluded that the BoP interpretation of the relevant statute is likely incorrect, the Petitioners have demonstrated a likelihood of success on the merits of their application for relief in the nature of *mandamus*. A stay or preliminary injunction is proper.

iii. The Bureau of Prisons policy was promulgated without observing the procedures required in the Administrative Procedures Act

Petitioners next argue that the Bureau of Prisons violated the procedural guarantees of the Administrative Procedures Act. They argue that the policy change of December was in fact rule making. They maintain that the APA applies to the BoP generally, and that the type of rule making at issue in this case is not exempted from the APA in 18 U.S.C. § 3625.

■ A rule is defined by the APA as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law . . . ." The legal issue is basically whether the new BoP policy is a rule so that the APA's notice and comment procedures apply, or whether it is adjudication that does not require notice and comment. Even assuming that the BoP is simply adjudicating by interpreting federal law, if that interpretation "departs from a longstanding agency practice, it too must be promulgated pursuant to the APA notice and comment procedures." *Ferguson v. Ashcroft*, 248 F.Supp.2d 547 (M.D.La. 2003) (citing *Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir.2001)); *McDonald v. Federal Bureau of Prisons*, Civil Action No. 1:03–CV–235–RWS at 13 (N.D.Ga. February 14, 2003) (citing *Jean v. Nelson*, 711 F.2d 1455, 1481 (11th Cir.1983)).

As is the case with some of the arguments discussed *infra*, a sister Court has relied on precisely this argument in enjoining application of the new BoP policy to a plaintiff similarly situated to the Petitioners in this case. *Ferguson*, 248 F.Supp.2d 547. There, the Court concluded that there was a likelihood that the new BoP policy was a rule (or a radically new interpretation) such that the notice and comment requirements of Section 553 of the APA should have been followed. This Court concludes that because another Court has relied on this argument in enjoining retroactive application of the new BoP policy to a Petitioner similarly situated to the Petitioners in this case, the Petitioners have met their burden of "rais[ing] questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Blackwelder*, 550 F.2d at 195.

iv. Retroactive application of the Bureau of Prisons policy violates Due Process and equitable estoppel

■ This is the precise ground relied upon by the United States District Court for the District of Columbia in a recent decision. *Culter v. United States*, 241 F.Supp.2d 19 (D.D.C.2003). Assuming that the new BoP interpretation was correct, Judge Huvelle nonetheless determined that it could not be retroactively applied to an individual similarly situated to the Petitioners in this case because "[f]or the government to imprison petitioner [at a correctional institution other than a CCC] merely because BoP was misguided about the scope of its authority and this misinterpretation was fostered and shared by both the Executive and Judicial branches for more than fifteen years is simply arbitrary and unfair." *Id.* at 26. The government can certainly correct mistaken interpretations of law, but to allow the belated correction of the legal interpretation at issue in this case to be applied to Petitioners is "so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause" of the Fifth Amendment. *Id.* at 24 (quoting *DeWitt v. Ventetoulo*, 6 F.3d 32, 35 (1st Cir.1993)). Similarly, in *Culter* the Court determined that the government would be estopped from retroactively applying new interpretations of existing law if such corrections "involve[ ] prejudice and harm beyond frustrated expectations." *Id.* at 24–25 (quoting *Lerner v. Gill*, 751 F.2d 450, 459 (1st Cir.1985)). There is clear evidence that Petitioners would likely suffer prejudice, not merely frustrated expectations, in the absence of a stay or preliminary injunction. *See supra* part III.B.

The Court concludes that the fact that a sister Court has relied on these grounds in deciding to enjoin application of the

changed BoP policy to a Petitioner similarly situated to the Petitioners in this case is evidence that the Petitioners have met their burden to "raise[ ] questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Blackwelder*, 550 F.2d at 195. On this ground alone, therefore, a stay or preliminary injunction is warranted.

The Court also notes that a number of additional Due Process concerns arise given the logical extension of the new BoP policy. For instance, at the February 20 hearing the Court asked counsel for Respondent whether Petitioners would be given credit for the time they have already served at the McLeod Center. The Court asked if there was anything preventing the BoP from making Petitioners begin their "imprisonment" anew, given that the BoP now claims they have never been imprisoned. The issue is really more fundamental: does the BoP have legal authority to credit Petitioners time served at the McLeod Center if it did not meet the statutory definition of imprisonment? The Court also inquired whether individuals, who served their entire sentence period at the McLeod Center and think that they have paid their debt to society, are actually subject to designation to another institution for the service of their sentence of "imprisonment."

Counsel for Respondent responded that the Due Process and *Ex Post Facto* clauses would likely require that Petitioners and other convicts who have served time at a CCC thinking that they were imprisoned would have to be credited for that time. But Respondent has never explained to the Court how the BoP would have the legal authority to do so if its new policy is correct. That is, BoP claims that it is legally compelled to redesignate Petition-

ers because it lacks the authority initially to designate them to the McLeod Center. If that is the case, then, how does the BoP have the legal authority to delay redesignating prisoners; how does BoP have the authority to redesignate only some prisoners serving allegedly illegal sentences (those who had more than 150 days remaining); how does the BoP have the authority to credit Petitioners for time served? If the BoP has legal authority to delay redesignation, redesignate only some prisoners, and credit Petitioners for time served, then the BoP can hardly claim that it is legally compelled to redesignate them in the first place. And if the BoP is compelled only by Due Process and the *Ex Post Facto* clauses to credit time served, is that not a recognition that, for constitutional purposes, there is a distinction between initial designation and redesignation after serving some time in a CCC? Does not logic force the conclusion, therefore, that Due Process recognizes creation of a liberty interest after initial designation to a CCC and service of part of a sentence of imprisonment there? Based on these unanswered questions, the Court believes that Petitioners have demonstrated a likelihood of success on the merits with regards to their Due Process argument.

v. Retroactive application of the Bureau of Prisons policy offends the *Ex Post Facto* clause of the Constitution as well as general principles of law restricting retroactive application of changes in law

 Petitioners next point to the *Ex Post Facto* clause as well as the general principle of law prohibiting the retroactive application of changes of law in challenge to their redesignation pursuant to the new BoP policy. *Landgraf v. USI Film Products*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Petitioners also argue that the BoP has not been authorized by

Congress to promulgate retroactive rules. *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *Cort v. Crabtree,* 113 F.3d 1081 (9th Cir.1997).

As with several arguments described *supra,* a sister Court has relied on the *Ex Post Facto* argument in enjoining the application of the BoP's new interpretation to a Petitioner similarly situated to the Petitioners in this case. *Ashkenazi v. Attorney General of the United States, et al.,* 246 F.Supp.2d 1 (D.D.C.2003). In that case, Judge Kessler held that to allow the retroactive application of the new BoP interpretation after the Petitioner relied on the old practice in negotiating and agreeing to a plea, would likely violate the *Ex Post Facto* clause. *Id.* at 4 ("A significant factor motivating Plaintiff to accept the plea agreement was his expectation that he was eligible to serve his sentence in a CCC and that the BoP would exercise its long-standing discretion, as it had for the past seventeen years, to determine whether he should be placed in a halfway house.").

Judge Kessler first determined that the policy did apply retrospectively within the meaning of existing Supreme Court precedents. Next, Judge Kessler held that it was likely that the change in BoP policy did disadvantage the Petitioner, rejecting the government's contention that the change did not relate to the original penalty assigned to the crime and therefore did not violate the *Ex Post Facto* clause. *Id.* at 4. The Supreme Court has held that retroactive application of a new statutory interpretation making a prisoner ineligible for a reduction in punishment violates the *Ex Post Facto* clause. *Id.* at 4 (citing *Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997)). Judge Kessler then held that an agency reinterpretation of a statute, even if correct, could likely cause an *Ex Post Facto* clause viola-

tion. *Id.* at 4 (discussing Supreme Court precedent which states that " 'a law need not impair a 'vested right' to violate the *ex post fact* prohibition.' Instead, the Court emphasized that it is the 'lack of fair notice' that is critical to relief under the *Ex Post Facto* Clause") (quoting *Weaver v. Graham,* 450 U.S. 24, 30, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)).

As noted above, the fact that a sister Court has relied on the *Ex Post Facto* clause in holding that the new BoP policy should be enjoined is highly persuasive to this Court that Petitioners have met their burden of "rais[ing] questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Blackwelder,* 550 F.2d at 195.

vi. Retroactive application of the Bureau of Prisons policy using an arbitrary 150–day cutoff for application violates equal protection

Petitioners maintain that the retroactive application of the new BoP policy based on the 150–day rule violates Equal Protection. The BoP decided to redesignate only those prisoners who had more than 150 days remaining of their sentence on December 16, 2002. Given that there is no allegation that Petitioners are members of any suspect class so as to justify heightened scrutiny, the policy simply must survive rational basis scrutiny. *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 442, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Petitioners argue that the 150–day is arbitrary and irrational and must fail rational basis scrutiny. *Id.* at 446, 105 S.Ct. 3249. At the hearing, counsel for Respondent maintained that the 150–day rule was imposed because the new BoP policy did not go into effect until late January, essentially building in thirty additional

days to bring the BoP policy into line with the 6-month provision of 18 U.S.C. § 3624(c) and the Sentencing Guidelines. However, counsel for Petitioners exposed this justification as erroneous conjecture by pointing out that the 150 days is calculated from December 16 not the date in late January when redesignations were to have been effected. Therefore, thirty additional days are not built in and the BoP policy is not in line with the 6-month provision of 18 U.S.C. § 3624(c) and the Sentencing Guidelines. Respondent has articulated no other allegedly "rational" basis for the 150-day rule. As a result, the Court must conclude that the Petitioners have demonstrated a likelihood of success on the merits with regards to this argument, or, at the very least, have raised substantial questions about whether the 150-day rule is based on reason and is related to the legitimate purpose of the policy, so as to justify additional investigation by the Court.

### D. Public Interest

The final prong of the *Blackwelder* test requires that the Court consider whether a preliminary injunction or stay would in any way harm the public interest. The Court believes that the public interest weighs heavily in favor of the Petitioners. The public has an interest in prisoners rehabilitating themselves and their reputation in the community, if they are not a security risk. The public interest would be harmed by the Petitioners no longer being able to work and support their families. The public interest would be similarly injured by any violation of statutory or constitutional rights.

### IV. CONCLUSION

Based on the foregoing analysis, IT IS HEREBY ORDERED that the Respondent's planned redesignation of Petitioner's away from the McLeod Center is STAYED.

IT IS FURTHER ORDERED that Petitioner's motion for preliminary injunction is GRANTED and Respondent is ORDERED not to redesignate or transfer Petitioner's away from the McLeod Center pending further order of this Court.

IT IS FURTHER ORDERED that Respondent's motion for clarification or to stay the oral order pending appeal is DENIED.[3]

---

**3.** The Court is really at a loss for words with regards to this motion. Respondent filed the motion on February 27, 2003 asking for a stay of the oral order granted by the Court on February 20, 2003. The Court wonders why Respondent would submit a motion for clarification one day before the Court's previously announced written opinion was scheduled to issue. This superfluous motion merely delayed the Court's scheduled Order.

Additionally, Respondent makes the leap in the motion that the Court must have intended to simply continue its temporary restraining order, even though the Court made it clear that it was entering a stay, or if a stay was later determined to be inappropriate, a preliminary injunction. In no way did the Court imply that its oral order was just a continuation of the T.R.O. Respondent's legal analysis and factual suppositions could not be more erroneous. The Court made clear at the hearing that it was entering a stay. As described above, the Court has concluded that it has such authority under its inherent powers as an analog to the statutory authority granted in 28 U.S.C. § 2251.

Respondent cites § 2251 as an example of a statute that provides for stays only against a state court proceeding and not against an executive officer of the state. Respondent then quotes part of the statute: "stay any proceeding ... in any State court" .... The Respondent's unbelievable error is that he fails to quote the entirety of the statute, which clearly provides that a stay can issue against "any proceeding against the person detained in any State court *or by or under the authority of any State* for any matter involved in the *habeas corpus* proceeding." 28 U.S.C. § 2251 (emphasis added). In short, the stat-

IT IS FURTHER ORDERED that the Parties confer with the goal of arriving at an agreement to expedite the hearing of the application for writ of *habeas corpus* or relief in the nature of *mandamus* on the merits. The Parties are directed to inform the Court of their agreed plan so it can hear the merits of the application as soon as possible.

ute allows for a stay of any proceeding, judicial or otherwise, relating to the subject matter of the *habeas corpus* petition. The Court's inherent powers are similar. Section 2251 is often used to stay the execution of capital defendants and such a stay is typically addressed to the state official responsible for the execution, not to a particular court. Additionally, simply because a Court has used the words stay and injunction interchangeably does not imply that the Court is operating under the Federal Rule of Civil Procedure injunction provision rather than the *habeas corpus* stay statute or its inherent powers. The inherent power to take the necessary time to consider an application for a writ of *habeas corpus* is fundamentally different from its statutory power to enter injunctions.